UNITED STATES of America,
Plaintiff-Appellee,

v.

Kendal INGRAM, Defendant-Appellant.

No. 77–1926.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Jan. 24, 1979.

Decided June 11, 1979.

Carole C. Dominguin, Denver, Colo. (Joseph F. Dolan, U. S. Atty., and Rodney W.

Snow, Asst. U. S. Atty., Denver, Colo., on the brief), for plaintiff-appellee.

Lynn W. Lehmann, Denver, Colo., for defendant-appellant.

Before McWILLIAMS, DOYLE, and McKAY, Circuit Judges.

McWILLIAMS, Circuit Judge.

In separate indictments Kendal Ingram and his older brother, Keith Ingram, were charged with the robbery of the Key Savings and Loan Association, a federally insured corporation maintaining a branch office at 2400 West Alameda Avenue in Denver, Colorado, in violation of 18 U.S.C. § 2113(a) and (d). In separate trials both defendants were convicted and Kendal Ingram appeals his conviction.

The Government's case-in-chief established that Kendal Ingram and his brother Keith had robbed the Key Savings and Loan Association of some $1,740· in money and approximately $4,800 in travelers cheques on December 29, 1976. Keith Ingram was armed with a gun. The two fled the scene, and Kendal Ingram was arrested some six months later, in St. Louis, Missouri.

One of the two tellers in the office of the Key Savings and Loan Association identified Kendal Ingram at trial as being one of the two robbers. The other teller could not identify Kendal Ingram. A surveillance camera located in the Savings and Loan office took photographs of the robbery in progress, and twenty-four of these exhibits were introduced into evidence and viewed by the jury.

■ Two Government witnesses who were acquainted with Kendal Ingram had been shown, prior to trial, certain of these surveillance photographs and each admitted in a pre-trial identification statement that

she had at that time identified Kendal and Keith Ingram as being the two robbers depicted therein. At trial, however, neither witness would identify Kendal Ingram as being one of the robbers shown in the photographs, though one did identify Kendal's brother, Keith Ingram.*

Kendal Ingram testified in his own behalf and denied that he had participated in the robbery. He admitted being in Denver, Colorado on December 29, 1976, the day of the robbery, but said that at the time of the robbery he was several miles away from the Savings and Loan office in the home of a friend playing cards. He testified that he was not one of the two robbers depicted in the surveillance pictures, and other persons who were acquainted with him offered similar testimony.

■ On appeal counsel asserts that it was error for the trial court to have permitted certain Government witnesses to identify Kendal Ingram as one of the two robbers depicted in the surveillance pictures. It is argued that such opinion testimony by a lay witness is of doubtful help to the members of the jury, who had before them the surveillance pictures and could make their own comparison between the person depicted in the pictures and the defendant, who was before them in open court. This argument, however, overlooks one important fact, namely, that the jurors were not previously acquainted with the defendant, whereas the two Government witnesses were close acquaintances of Ingram. Further, there was some evidence that Kendal Ingram's appearance had changed between the time of the robbery and the trial. In such circumstance the identification by these two witnesses could conceivably have been of aid and assistance to the jury. We fail to see how the admission of such evidence could

---

* Inasmuch as both witnesses were available at trial and were subjected to thorough cross-examination concerning their out-of-court identification statements, one of which was reduced to writing and signed, such statements may be considered by the jury for substantive purposes. See Fed.R.Evid. 801(d)(1)(C); [1975] U.S.Code Cong. & Admin.News pp. 1092, 1094–

95; *Gilbert v. California,* 388 U.S. 263, 272 n.3, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1966); *United States v. Capps,* 578 F.2d 48 (10th Cir. 1978); *United States v. Hudson,* 564 F.2d 1377, 1379 (9th Cir. 1977); *Anderson v. Maggio,* 555 F.2d 447, 449–50 (5th Cir. 1977); *DiAngelo v. United States,* 406 F.Supp. 880 (E.D.Pa.1976).

constitute reversible error. *United States v. Jones,* 557 F.2d 1237, 1238 (8th Cir. 1977).

In *United States v. Butcher,* 557 F.2d 666 (9th Cir. 1977), the Ninth Circuit held that so-called lay opinions identifying a defendant as the person depicted in a surveillance photograph, when based on prior contacts and conversation, fall within the parameters of Fed.R.Evid. 701. In *Butcher,* the persons who identified the defendant in the surveillance photograph were police and parole officers who knew the defendant. Though the calling of policemen and parole officers to offer such lay opinion evidence was described as a practice "not to be encouraged," the Ninth Circuit held that under the circumstances there was no prejudicial error.

In *United States v. Calhoun,* 544 F.2d 291 (6th Cir. 1976), the Sixth Circuit held that the trial court erred in permitting the defendant's parole officer to identify the defendant as being in the surveillance photograph, because such necessarily impinged on the right to freely bring out the relationship between the witness and the defendant, which would reveal the defendant's status as a parolee. In thus holding, the Sixth Circuit indicated, however, that such testimony might well be admissible if it were not coming from a parole officer, although under the circumstances of that case, such testimony, coming from anyone, "teases the outer limits of Rule 701."

Here, of course, the identification testimony did not come from police or parole officers who were acquainted with the defendant. We are not, therefore, faced with the precise problem presented in *Butcher* or *Calhoun.* Rather, the two Government witnesses who had identified Kendal Ingram in the surveillance photographs soon after the robbery were the friends in whose home Kendal was temporarily residing at the time of the robbery. We hold that such lay opinion evidence was admissible under Fed. R.Evid. 701. See *United States v. Murray,* 523 F.2d 489, 491 n.1 (8th Cir. 1975).

As above indicated, Ingram was arrested some six months after the robbery at the home of his mother in St. Louis, Missouri. When F.B.I. agents, armed with an arrest warrant, knocked at the front door of the home, Kendal ran out the back door and was arrested by an agent covering the rear of the house. At that time, Kendal Ingram gave the name of his younger brother and misstated his age as being only seventeen. After being informed as to the reason for his arrest and after a *Miranda* warning, Ingram was asked as to his whereabouts on December 29, 1976, the date of the robbery. Ingram replied that though he wasn't sure, he believed that he was at Fort Carson, Colorado on the day of the robbery and had not left the military base until around six o'clock in the evening, several hours after the robbery. At trial the Government established that such was incorrect, and that the truth of the matter was that Ingram had left Fort Carson on December 23, 1976, some six days before the robbery.

■ The Government sought, and the trial court gave over objection, an instruction regarding false exculpatory statements, and such is now assigned as reversible error. We have held that false exculpatory statements are admissible to prove consciousness of guilt and unlawful intent. *United States v. Tager,* 481 F.2d 97 (10th Cir. 1973), *cert. denied,* 415 U.S. 914, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974). The fact that Ingram "wasn't sure" when he left Fort Carson doesn't neutralize his further statement that to the best of his knowledge he had not left Fort Carson, located some eighty miles south of Denver, until the early evening of December 29, 1976, several hours after the robbery took place. Such was clearly intended to be exculpatory and thereby rendered admissible the Government's evidence that in fact Ingram left Fort Carson some six days *before* the robbery, not four hours *after* the robbery. The instruction given to the jury was in the language of E. Devitt & C. Blackmar, Federal Jury Practice and Instructions, § 15.12 (3d ed. 1977). Actually, the instruction is relatively innocuous and leaves exclusively to the jury the question as to whether false exculpatory statements, if made, indicate consciousness of guilt, or nothing at all.

■ The only issue in the trial of this case was the one of identification. There is no dispute that the Key Savings and Loan Association was robbed at about two o'clock p. m. on December 29, 1976, by two young blacks, one of whom carried a gun. The only issue is whether Kendal Ingram was one of the robbers. Under the circumstances, any instruction concerning identification of the defendant took on added significance. The instruction now in question was given in the language of E. Devitt & C. Blackmar, Federal Jury Practice and Instructions, § 15.19 (3d ed. 1977). According to defense counsel, however, this instruction did not go far enough. Counsel had asked for an additional instruction which would have pointed out to the jury that the teller who identified Ingram was a white person, whereas Ingram was a black person, and then would have gone on to state that "in the experience of many it is more difficult to identify members of a different race than members of one's own." The trial court refused to give such additional instruction, and such refusal is now assigned as reversible error.

In arguing for an additional instruction on inter-racial identification, the defendant relies primarily on a concurring opinion by the then Chief Judge Bazelon in *United States v. Telfaire,* 152 U.S.App.D.C. 146, 469 F.2d 552 (1972). A so-called model instruction on identification was set forth as an appendix to that opinion. The instruction on identification given in the instant case is comparable to the model instruction approved in *Telfaire,* and, as indicated, is virtually verbatim to that appearing in Devitt & Blackmar.

In *Telfaire,* Judge Bazelon, however, would have gone beyond the model instruction there approved and would have included in the model instruction language to the effect that members of one race have greater difficulty in accurately identifying members of a different race. Judge Bazelon's suggestion was not concurred in by the other members of the panel in *Telfaire,* nor do we concur in such suggestion. A jury is to be instructed on the law of the case, and an instruction on inter-racial identification along the lines indicated is more in the realm of argument than law. The instruction given here on identification was, under the circumstances, more than adequate. The refusal to give an inter-racial instruction was not error.

■ The next matter urged as ground for reversal concerns the sufficiency of the evidence. Counsel states that the only evidence tying Kendal Ingram into the robbery was the in-court identification of the defendant by one of the tellers, and the very equivocal testimony from two other witnesses that one of the individuals in the surveillance photos looked like the defendant. Even if such were the case, and disregarding the pre-trial identification statements, such evidence would be sufficient to support the guilty verdict. The Anglo-American jurisprudence has accepted the so-called "one witness" rule, and, with certain exceptions not here pertinent, does not require a greater number of witnesses for corroboration. *United States v. Telfaire,* 152 U.S.App.D.C. 146, 469 F.2d 552 (1972).

In summarizing the incriminating evidence adduced by the Government, however, defense counsel overlooks what to us is an important part of the Government's case, namely the surveillance photographs. A camera took virtually a motion picture of this robbery while it was in progress. Neither of the robbers wore a mask of any type. The Government introduced some twenty surveillance photographs, and the defendant introduced four additional photos. On the whole, these pictures were quite clear. These photographs were viewed by the jury. In closing argument, defense counsel asked the jury to take a good look at the defendant's face and to compare it with the pictures and then "make your own judgment." The jury has now made its "judgment" of the matter, and we, as an appellate court, should not overturn the jury's resolution of what is peculiarly an issue of fact.

■ Minor complaint is made about the sentencing procedure. Defendant was sentenced under the Youth Corrections Act,

and it is asserted that the trial court improperly considered a juvenile conviction suffered by the defendant in a state court in Colorado. We find no error in this regard and will not belabor the point.

Judgment affirmed.