**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**W. Darrell ZANG and Louis Porter,**
**Defendants-Appellants.**

**Nos. 80–2227, 80–2228.**

United States Court of Appeals,
Tenth Circuit.

June 7, 1982.
Rehearing Denied April 26, 1983.

B. Hayden Crawford, Tulsa, Okl. (Joe D. Dillsaver, Tulsa, Okl., with him on the brief), of Crawford, Crowe & Bainbridge, Tulsa, Okl., for defendant-appellant W. Darrell Zang.

John A. Field, III, of Jerris Leonard & Associates, P. G., Washington, D. C. (James C. Lang and William J. Wenzel, of Sneed, Lang, Adams, Hamilton, Downie & Barnett, Pat Malloy and Pat Malloy, III, of Malloy, Thompson & Malloy, Tulsa, Okl., with him on the briefs), for defendant-appellant Louis Porter.

Stephen P. Learned, U. S. Dept. of Justice, Washington, D. C. (Frank Keating, U. S. Atty., N. D. Okl., Tulsa, Okl., with him on the brief), for plaintiff-appellee.

Before SETH, Chief Judge, McWILLIAMS, Circuit Judge, and BRIMMER, District Judge *.

SETH, Chief Judge.

The defendants, W. Darrell Zang and Louis Porter, were convicted by a jury of one count of conspiracy (18 U.S.C. § 371), six counts of mail fraud (18 U.S.C. § 1341 and § 2), eight counts of wire fraud (18 U.S.C. § 1343 and § 2), and one count of racketeering (18 U.S.C. § 1962(a), § 1963, and § 2). The court sentenced each of the defendants to five years on each count to be served concurrently, a total fine of $49,000, and ordered the forfeiture, pursuant to 18 U.S.C. § 1963(a)(1), of the defendants' respective interests in Dalco Investments, which included an interest in the Dalco Building.

The facts leading up to their indictment and conviction concern the purchase and resale of crude oil. The government alleged that from approximately December of 1976 through September of 1978 the appellants fraudulently miscertified over one million barrels of lower tier priced controlled crude oil as higher tier crude oil resulting in an illegal profit of nearly 7.5 million dollars.

Mr. Porter owned, among other businesses, a company known as Dalco Petroleum, Inc. which had as one of its wholly owned subsidiaries, Dalco Crude, Inc. (Dalco). In 1976 he formed Dalco Crude, Inc. to operate a crude oil and natural gas liquids trading business. Mr. Porter hired Mr. Zang to run the enterprise. Mr. Zang had previously been the vice president and regional manager of Western Crude Oil, Inc. (Western). As the manager of Dalco Crude Mr. Zang received an annual salary and an interest in the profits. Later in January of 1978 Dalco Crude, Inc. was succeeded by Dalco, Inc., a company owned jointly by Mr. Porter and Mr. Zang.

In December of 1976 Dalco negotiated with Cities Services (Cities) for the purchase of 310,000 barrels of low tier crude oil. Under that contract Dalco would pay Cities' acquisition cost which was based on posted prices for crude oil, the gathering charges or pipeline fees, plus 24 cents per barrel. Dalco simultaneously resold the crude to Western. Under the contract with Western Dalco received an acquisition cost based on posted prices, plus 19 cents per barrel.

The basis for the indictment was that Dalco recertified the lower tier crude oil from Cities as high tiered crude oil and thus a higher priced crude, when it was resold to Western. The then prevailing price control regulations required the producer to certify the tier of the oil sold and each reseller was required to certify the crude to its purchaser to be of the same tier as the certification

---

* Honorable Clarence A. Brimmer, Chief United States District Judge for the District of Wyoming, sitting by designation.

it received. The certification was usually typed on the reseller's invoice. As a reseller Dalco was thus required to pass onto Western the same tier designation it had received for the oil. Because of the fraud perpetrated through miscertification the government alleged that Dalco overcharged Western $7,482,837.

Similar arrangements were negotiated between Cities and Western through July of 1978. Dalco negotiated for the purchase and resale of about 15,000 barrels per day, and over a fifteen-month period 7,629,442 barrels were traded in this manner.

Mr. Porter claims that he had no involvement in the transaction except for financing. He claims that Mr. Zang was in charge of preparing the invoices and that he was never aware of any violations until September or October of 1978. Mr. Zang claims that he did not intend to defraud Western, downstream purchasers, or the United States. He argues that he made a good-faith effort to comply with what he described as the confusing and complicated pricing and certification regulations. The appellants advance several points on appeal:

1. What had become known as the BAC invoice and Falcon letter were improperly admitted into evidence;

2. The conspiracy convictions were not supported by the evidence;

3. The trial court should have dismissed the RICO count;

4. Several of the defendants' exhibits concerning the DOE regulations were improperly excluded;

5. The trial court wrongfully denied defendants' requested jury instructions;

6. The Emergency Petroleum Allocation Act (EPAA) implicitly preempts Title 18.

The appellants argue that the BAC invoice and the Falcon letter were improperly admitted as false exculpatory evidence. These documents resulted from an attempt by Mr. Zang and Mr. Porter to cover up the crude oil certification imbalance. Thus on March 31, 1978 Mr. Porter had prepared and placed in Dalco's file an invoice from BAC Petroleum billing Dalco $275,000 as BAC's commission for arranging Dalco's purchase of foreign crude from Falcon Petroleum, Ltd. This transaction allegedly occurred in March and April of 1978 in an effort to balance Dalco's incoming and outgoing crude oil tier certification. This liability was questioned in late August of 1978 when an outside auditor asked why the liability had not been paid. Mr. Porter explained that since Dalco was unable to obtain port facilities the offer of foreign crude oil had to be turned down, but he and John Draughon, his business partner from BAC, agreed to the $275,000 commission.

However, the accountants requested confirmation of this liability. Mr. Porter explained that confirmation would be difficult to obtain since Mr. Draughon was reluctant to claim an interest in the foreign company, Falcon, because of tax reasons. On September 8, 1978 Mr. Porter dictated a letter to Allen McNaughton of Falcon Petroleum in Bermuda. The letter recounted the alleged transaction and requested that Dalco be allowed to withhold payment temporarily. At Mr. Porter's direction no file copies were made and one copy was sent to Dalco's controller to show the outside auditors. This "Falcon letter" was returned marked "addressee unknown." Mr. Porter told his secretary to forget about it. However, based on the BAC invoice, the Falcon letter, and Mr. Porter's assurances that the transaction was valid, the liability was left on the books at the end of the year. The record demonstrates that Mr. Draughon had no such interest in Falcon Petroleum. Falcon Petroleum did not exist and Dalco never had such a foreign crude oil transaction.

The appellants claim that the BAC invoice and the Falcon letter are not really false exculpatory evidence. They argue that the foreign crude oil transaction meant to balance their certificates would not have exculpated them on the government's theory of fraud. And, even if it was proper false exculpatory evidence, they argue it caused unfair prejudice and confusion so the trial court should have excluded it:

■ False exculpatory statements made by a defendant are admissible to prove circumstantially consciousness of guilt or unlawful intent. *United States v. Ingram*, 600 F.2d 260 (10th Cir.); *United States v. Tager*, 481 F.2d 97 (10th Cir.). Such statements cannot be considered by the jury as direct evidence of guilt. *United States v. Boekelman*, 594 F.2d 1238 (9th Cir.).

The trial court admitted these documents noting that the evidence was allowed to show intent. The trial court carefully instructed the jury that a defendant's attempt to fabricate evidence after an alleged violation of the law is not sufficient to establish guilt.

■ The appellants argue that the evidence concerns balancing Dalco's tier inventory, which is unrelated to the fraud charges. We disagree. Miscertification was the method by which the fraud was perpetrated. The invoice and the letter were attempts to prevent the detection of the tier miscertification. Thus we find that there was no error in admitting the documents as false exculpatory evidence. The judge fully instructed the jury on the use of such evidence; therefore, it was for the jury to weigh the testimony and the evidence and determine whether the false exculpatory evidence indicated a consciousness of guilt or nothing at all. *See United States v. Ingram*, 600 F.2d 260 (10th Cir.).

■ The balancing of the probative value of evidence against its prejudicial effect is left to the discretion of the trial court. We will reverse only for a clear showing of abuse of discretion. *United States v. Harris*, 534 F.2d 207 (10th Cir.). The evidence was offered for a specific purpose, the jury was properly instructed, and thus the invoice and letter were properly admitted into evidence.

As to the conspiracy charge, the appellants contend that the evidence was insufficient to support the jury's verdict. Specifically they argue that the government never produced evidence of an unlawful agreement between them.

■ We have held in many cases that the agreement in a conspiracy may be either express or implied, and that the parties must have a meeting of the minds in the common design, purpose, or objects of the conspiracy. *United States v. Lopez*, 576 F.2d 840 (10th Cir.); *United States v. Butler*, 494 F.2d 1246 (10th Cir.). Frequently the agreement to cooperate is not susceptible of direct proof because the nature of the crime and the unlawful agreement may be established by circumstantial evidence. *United States v. McMahon*, 562 F.2d 1192 (10th Cir.); *McManaman v. United States*, 327 F.2d 21 (10th Cir.). In determining the sufficiency of the evidence the inferences drawn are reviewed in the light most favorable to the government. *United States v. Erb*, 596 F.2d 412 (10th Cir.). Thus the conspiracy conviction will be sustained if from the circumstances, acts, and conduct of the appellants it can reasonably be inferred that they agreed to miscertify the crude oil with the intent to defraud. *See United States v. Parnell*, 581 F.2d 1374 (10th Cir.); *United States v. Anderson*, 352 F.2d 500 (6th Cir.).

■ Mr. Porter formed Dalco Crude, Inc. which later became Dalco, Inc. primarily for crude oil resale. The volume of business in the fifteen-month period was large and the transactions grossed some $7,595,964 in profit, of which only $93,129 represented legitimate profit. To obtain the multimillion dollar letters of credit to cover the monthly crude oil purchases Mr. Porter and Mr. Zang signed personal loan guarantees. Additionally, Mr. Porter pledged the stock of his public company, Great Yellowstone Corporation, as a guarantee. The financial stakes were high for both Mr. Porter and Mr. Zang. The volume of oil traded, the personal guarantees, and the inordinately high profits make the transaction one in which the jury could reasonably infer that Mr. Porter was well aware of the nature, scope, and value of the transactions. Also, it may be readily inferred from the evidence that Mr. Zang and Mr. Porter worked together to design the scheme and to attain its objective.

The government also introduced evidence directed to Mr. Porter's knowledge of the very high profits. In early January of 1977 two Dalco auditors spoke with Mr. Porter about the Cities-Western transaction. They had noticed that the outgoing invoices certified the 310,000 barrels of crude oil at a higher tier designation than had the incoming invoices for the same crude oil. Although they knew very little about the federal pricing and certification regulations, they did realize that the transaction cleared unusually high profits. Richard Clark, a subsidiary company president, also testified that he reviewed the regulations and concluded that the transaction was possibly illegal. All three testified that they told Mr. Porter about the problem and he simply referred them to Mr. Zang. All three resigned shortly thereafter citing as the reason the manner in which the crude oil trading was being handled.

In early March of 1978 the accounting firm of Haskins and Sells examined invoices dated in December of 1977 as part of a fee proposal. These invoices indicated that Dalco resold 750,000 barrels of crude oil at a penny less per barrel than it had paid for it. Nevertheless Dalco grossed a $450,000 profit. This was accomplished by changing the low tier certification to upper tier crude and stripper. These accountants testified that they pointed out the irregularity to Mr. Porter and showed him the invoices. Mr. Zang had told them that he was trying to "balance" the tiers. Furthermore he told them that they must review the entire year to determine if the tier certifications were balanced. The auditors requested documentation but they never received any and consequently the firm resigned from the audit. About the same time Dalco's auditor also resigned.

In the summer of 1978 Mr. Porter engaged the accounting firm of Peat, Marwick and Mitchell to audit both Great Yellowstone Corporation and Dalco. The Peat Marwick auditors pointed out the tier imbalances on the invoices. The firm requested exchange and certification schedules for the entire year from Mr. Porter. Although Dalco never provided those schedules, Peat Marwick prepared a crude oil trading schedule for Dalco based on the auditing information it had gathered. Their audit showed that a tier imbalance existed for the entire year.

Throughout this fifteen-month period Mr. Porter had control over the Dalco profits. Three of the other companies received a portion of the gross profit from each trade. Mr. Zang and Mr. Porter created a partnership, Dalco Investments, which received a handling charge of 25 cents per barrel of oil traded.

Mr. Porter testified that he had nothing to do with the crude oil sales to Western, except for financing. He testified that he was unaware of any DOE violations until late September or early October of 1978. He claims that in arranging the financing of the oil trading, he only generally knew that Dalco was buying and selling the crude oil. He claimed that he had never specifically read the contracts. Additionally he denied ever being told by Haskins and Sells or any other auditors that the crude oil transactions looked illegal.

The evidence discloses that the oil tier certification systematically enabled Mr. Porter and Mr. Zang to make an inordinately large profit. Their financial investment in the venture was substantial. Evidence indicated that Mr. Porter was told repeatedly that regulations may have been violated and perhaps the transactions were illegal. Mr. Porter's agreement with Mr. Zang can be inferred from Mr. Porter's refusal to investigate the irregularities pointed out by auditors, his association and business ties with Mr. Zang which led to unusually high profits, and the fact that he had a large personal stake in the transaction. From this evidence and its reasonable inferences, a jury could reasonably infer that there was an informed and interested cooperation between Mr. Zang and Mr. Porter to recertify the crude oil invoices in order to defraud Western, and consequently the downstream buyers and the United States.

The appellants also contend that the evidence is insufficient to prove that they conspired to defraud the United States. The indictment charged the defendants with fraud against the United States in its Entitlements Program under the Emergency Petroleum Allocation Act (EPAA).

The Entitlements Program, 10 C.F.R. § 211.67, was a method of equalizing the acquisition costs of a refiner's crude oil. Under the program refiners who purchased and processed lower priced "old" oil in excess of the national average were required to compensate by cash payment the refiners who purchased and processed more expensive "new" oil. The tier designations enable the government to determine the entitlement. If lower tiered crude oil is miscertified as higher tiered crude then the entitlement is deflated.

The government introduced evidence that barrels of crude purchased by Western from Dalco were later sold to Gulf Oil and OKC. Mr. Mills of Western so testified. Tom Fagan and John Madden of Gulf Oil and OKC testified that their respective companies bought crude from Western. OKC was a refiner. Gulf reported its tier information at its refineries to DOE. Reviewing the evidence in the light most favorable to the government, it is reasonable for a jury to infer and find that the miscertification of lower tier crude oil impacted upon and disrupted the Entitlements Program administered by DOE. Where there is sufficient evidence to show that a federal program has been disrupted, the evidence is sufficient to support the finding of fraud against the United States. *See United States v. Johnson*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681.

The appellants next contend that the evidence is insufficient to support their convictions of mail fraud. They argue that the mailings were not sufficiently related to the alleged scheme to defraud, and thus their conduct was not within the mail fraud statute.

To warrant a conviction under the mail fraud statute the government must prove that a scheme to defraud exists and that a mailing was made for the purpose of that scheme. *United States v. Wolf*, 645 F.2d 23 (10th Cir.). The appellants argue that the indictment charged them with fraudulent miscertification of crude oil tiers on the invoices. They contend that the method of delivering the invoices was irrelevant to the legality of the transaction.

The mail fraud statute requires that the mails be an integral part of the scheme to defraud. *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603. This means that the item mailed be an integral part of the execution of the scheme. In this way the use of the mails becomes "incident to an essential part of the scheme." *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435. *See also United States v. Kent*, 608 F.2d 542 (5th Cir.). Clearly the scheme to defraud depended upon the invoices stating the tier certification. Mailing those invoices was necessary and an integral part of the scheme. Thus the mail fraud counts are supported by the evidence.

The appellants claim several errors with respect to the application of the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. §§ 1961–1968. In Count 16 of the indictment Mr. Zang and Mr. Porter were charged with receiving monies from a pattern of racketeering and willfully investing that income to acquire an interest in violation of 18 U.S.C. § 1962(a). The racketeering activity alleged consisted of the acts of mail and wire fraud also alleged in the indictment. The indictment further contended that Mr. Zang and Mr. Porter transferred to Dalco Investments approximately $1,067,576 of the profit obtained from the Cities-Western transaction. The government sought forfeiture of the appellants' respective interests in Dalco Investments, including its sole asset, the Dalco Building, pursuant to § 1963(a)(1).

Under RICO the government must prove both the existence of an enterprise and a connected pattern of racketeer-

ing activity. *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246. Mr. Porter and Mr. Zang each owned a 50% interest in a partnership called Dalco Investments. The partnership received a handling fee for the Cities-Western crude oil transactions. This constituted an ongoing association for the purpose of engaging in interstate commerce. It was a separate element proved by the government. Thus Dalco Investments was an "enterprise" within the meaning of the RICO statute. As the Court said in *Turkette*:

> "RICO also proscribes the investment of income derived from racketeering activity in an enterprise engaged in or which affects interstate commerce...."

■ The pattern of racketeering activity is a series of criminal acts as defined by the statute. *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246. In the case before us racketeering activity was the alleged wire and mail fraud. § 1961(1)(B). To prove a pattern, the government must establish two or more predicate offenses which are related to the activities of the enterprise. *United States v. Scotto*, 641 F.2d 47 (2d Cir.). The jury found the appellant guilty on all counts of mail and wire fraud. Those predicate acts concerned the fraudulent miscertification of crude oil tiers in the Cities-Western transactions. As such they were sufficiently related to the appellants' enterprise of selling crude oil to support the conviction under § 1962.

The appellants claim error in the trial court's instruction to the jury concerning the "pattern of racketeering." The court instructed the jury that to find "a pattern of racketeering activity the law requires at least two acts of racketeering activity." The appellants argue that the trial court's instruction should have also specifically stated that the two acts had to be related to constitute a pattern.

■ On review we must consider the trial court's instructions as a whole. The trial court instructed the jury that an activity of racketeering includes any act which constitutes a violation of the mail or wire

fraud statutes. The court further stated that if the government proved at least two of the wire and mail fraud counts then the pattern of racketeering activity would also be sufficiently proven. *See United States v. Weatherspoon*, 581 F.2d 595 (7th Cir.). Any two of the counts of mail and wire fraud alleged in the indictment were sufficiently related to the enterprise to constitute a violation of RICO. Based on the instructions as a whole, there was no need to explain specifically the required relationship.

The appellants also contend that they were wrongfully denied a special verdict under rule 31(e) of the Federal Rules of Criminal Procedure. This rule provides that "a special verdict shall be returned as to the extent of the interest or property subject to forfeiture, if any." 18 U.S.C. rule 31(e).

The appellants never made a timely request for a special verdict. The court asked the parties to review the verdict form and no objections were made. Once the jury began deliberations the appellants' attorneys brought the rule to the court's attention. However, they objected to any communication from the court to the jury to remedy the problem. They contended that it would be "reversible error and prejudicial to advise the jury on it [special verdict] during their deliberations because it would bring undue emphasis on this particular count [16]."

The trial court ruled that the parties had waived their right to a special verdict. It also determined that the defendants suffered no prejudicial error because the indictment specifically alleged only one enterprise interest subject to the forfeiture provision. Since the evidence was uncontroverted as to the defendants' interests in the partnership the court concluded that there was no issue of fact concerning the tracing of funds or determining specific property to be forfeited.

■ There was no error in the use of a general verdict in this case. The parties can waive their right to a special verdict by

not making a timely request. *See United States v. Desmond*, 670 F.2d 414 (3d Cir.); *United States v. Jones*, 425 F.2d 1048 (9th Cir.). In this case the appellants waived their right and no plain error resulted. The evidence was uncontroverted so no factual issues were left to be decided by the jury. The indictment and jury instructions were about the partnership interests involved. By finding the defendants guilty of Count 16, the jury invoked the forfeiture provision. *See United States v. L'Hoste*, 609 F.2d 796 (5th Cir.). Thus there was no reversible error in not using the special verdict.

 The appellants also contend that the forfeiture of their interests in Dalco Investments, particularly the Dalco Building, was not supported by the weight of the evidence. The government sought forfeiture under 18 U.S.C. § 1963(a)(1) which provides that any person found in violation of § 1962 shall forfeit any interest acquired or maintained in violation of § 1962. Even though the "interest" is not specifically defined by the statute, its meaning can be derived from the activities barred by § 1962. The section proscribes three types of activities. The defendants were charged with violating § 1962(a), which prohibits the use or investment of racketeering income to acquire an interest in any enterprise. Thus the interest subject to forfeiture in this case is any interest in an enterprise acquired or maintained through racketeering income.

The enterprise at issue is Dalco Investments, a partnership equally held by Mr. Zang and Mr. Porter. Under the evidence adduced at trial the partnership's sole asset is the Dalco Building. Mr. Porter had transferred a half-interest in the building to Mr. Zang for value. They each contributed their share in the building to the partnership. The partnership received over a million dollars from the Cities-Western transactions, which was in turn used to pay the mortgage on the building.

 The appellants' interest in Dalco Investments which was acquired by tainted funds is subject to forfeiture. *See United States v. Marubeni America Corp.*, 611 F.2d 763 (9th Cir.). Merely contributing the building to a partnership is not prohibited by § 1962. *See United States v. Mandel*, 591 F.2d 1347 (4th Cir.). Thus the entire building is not necessarily subject to forfeiture. However, the partnership's interest in the building which was acquired by racketeering funds is subject to forfeiture under § 1963.

The government presented precise, uncontroverted evidence as to the amount of racketeering income funneled into Dalco Investments. It totaled $1,067,576. The untainted interests which may exist and the interests of innocent third parties should be protected. Thus we remand this issue to the district court to establish terms and conditions of the forfeiture under its authority described in 18 U.S.C. § 1963(c).

 The appellants claim that the trial court improperly excluded exhibits 6, 7, 8, 9, and the unpurged portion of exhibit 3. The defendants offered exhibits 6, 7, 8, and 9 in an effort to show that the pricing regulations for crude oil were confusing and vague. The trial court excluded those exhibits on the grounds of relevancy. The relevancy of evidence offered at trial is within the discretion of the trial court. We will not reverse on appeal unless the trial court abused its discretion. *United States v. Montgomery*, 582 F.2d 514 (10th Cir.); *United States v. Ray*, 488 F.2d 15 (10th Cir.).

 The defendants were charged with fraud, not with violating federal price controls. Under the indictment the scheme to defraud was executed through the miscertification of the tier of crude oil sold. Pricing violations were not included in the indictment and no evidence was offered that the defendants relied upon those documents for their interpretation of federal certification regulations. Thus the exhibits were properly excluded.

 Exhibit 3 is a letter from a Washington law firm to the Economic Regulatory Administration on behalf of Dalco.

The letter was written on October 24, 1978. The appellants argue that the letter contains the corporation's interpretation of the regulations which is relevant of the appellants' intent. The court excluded part of the letter constituting a legal opinion, but admitted the factual portions. The court determined that the legal opinion expressed in the letter was like an expert opinion by a witness who was unavailable for cross-examination. We find no abuse of the trial court's discretion in disallowing the admission of that portion of the letter constituting a legal opinion.

The appellants claim error in the trial court's refusal to give a number of the defendants' requested jury instructions. The admission or exclusion of a jury instruction is within the discretion of the trial court. However, a defendant is entitled to an instruction if there is support in the evidence and the law. *United States v. Prazak*, 623 F.2d 152 (10th Cir.).

The trial court denied the appellants' pricing and certification instructions because they were argumentative. Further under the indictment and evidence presented at trial, the pricing regulations were irrelevant. Compliance or noncompliance with the pricing regulations does not affect the application of the criminal statute. The trial court correctly denied those instructions.

The defendants requested a lesser included offense instruction which was denied by the trial court. The defendants argue that the lesser included offense was a violation of 15 U.S.C. § 754, which makes a violation of the EPAA certification regulations a misdemeanor. A defendant is entitled to a lesser included offense instruction when the lesser offense is established by the evidence adduced at trial. *United States v. Pino*, 606 F.2d 908 (10th Cir.). Additionally, however, an inherent relationship must exist between the two offenses. This does not exist here. A review of the considerations suggested in *United States v. Whitaker*, 447 F.2d 314 (D.C.Cir.), indicates that regulatory violations are not lesser included in offenses of conspiracy, mail or wire fraud, or racketeering. The elements, proof, and interests protected differ greatly. Thus the trial court did not abuse its discretion by denying the instruction.

The good-faith instructions requested by the defendants cannot be reviewed because the defendants never made a proper objection at the time of trial. There is no evidence that the defendants made a specific objection to the denial of these instructions. A generalized objection is insufficient to the matter objected to and the grounds for the objection as required by rule 30. *Maxfield v. United States*, 360 F.2d 97 (10th Cir.).

The appellants also claim that the EPAA regulations preempt or impliedly repeal the Title 18 criminal statutes. Under the EPAA regulations the crude oil reseller can be charged with a misdemeanor for miscertification. Mr. Porter and Mr. Zang were not charged with a violation of that statute, but rather they were charged with criminal violations.

An implied repeal requires a positive repugnancy between the provisions of the two laws. *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755; *Wood v. United States*, 41 U.S. 341, 10 L.Ed. 987. Nothing in the legislative history or the language of the statute indicates a desire by the Congress to make the EPAA the exclusive remedy for miscertification of oil tiers. In *Posadas v. National City Bank*, 296 U.S. 497, 56 S.Ct. 349, 80 L.Ed. 351, the United States Supreme Court said:

> "[R]epeals by implication are not favored. Where there are two acts upon the same subject, effect should be given to both if possible. . . . [T]he intention of the legislature to repeal must be clear and manifest."

Since we cannot find any intention of Congress to repeal or preempt the criminal statutes by the EPAA, we affirm the trial court's denial to dismiss the indictment.

The appellants' convictions are affirmed, but the case is remanded on the issue of forfeiture, consistent with this opinion.