**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 9, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

CLARENCE LEE DAVIS,

      Defendant-Appellant.

No. 05-5013

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 04-CR-85-JHP)**

Submitted on the briefs:

Art Fleak, Tulsa, Oklahoma, for defendant-appellant.

Kevin Danielson, Assistant United States Attorney (David E. O'Meilia, United States Attorney, with him on the brief), Northern District of Oklahoma, Tulsa, Oklahoma, for plaintiff-appellee.

Before **BRISCOE, McKAY,** and **McCONNELL** , Circuit Judges.

**BRISCOE** , Circuit Judge.

Clarence Davis appeals his conviction for conspiracy to commit armed bank robbery, in violation of 18 U.S.C. § 371; aiding and abetting an attempted armed bank robbery, in violation of 18 U.S.C. §§ 2 and 2113(a) and (d); brandishing, carrying, and possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 2 and 924(c); and for being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He also appeals his 360 month sentence.[*]

Davis argues that there was insufficient evidence to support his armed robbery convictions, and that the district court erred by admitting evidence concerning a purported false alibi and by instructing the jury on false exculpatory statements. He also challenges his sentence, arguing that his sentence was unreasonable under United States v. Booker, 125 S.Ct. 738 (2005), and that his classification as a career offender for sentencing purposes violated his Sixth Amendment rights because he was neither charged with being a career offender, nor was it proven to a jury beyond a reasonable doubt. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm both his convictions and his sentence.

I.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument.

On April 13, 2004, at approximately 9:45 a.m., Loyel Collier, a security guard for Riverwest Credit Union in Tulsa, Oklahoma, was sitting close to the union's front doors when he noticed two men enter the union and immediately step to the right. He thought this was unusual because most people upon entering walk straight toward the tellers. One of the men walked within arm's reach of Collier, pulled a gun from his waistband, and said, "Don't move." Collier, who had an extensive military background with training in the use of firearms and the identification of individuals, pulled out his gun and fired twice. Collier's first shot hit the glass partition separating him from the two men, but the second shot hit the man holding the gun. The two men then ran out of the door and up the street. When Collier followed, he saw an unoccupied red car with its engine running at the entrance of the union. At trial, Collier testified that he got a good look at both men, who were not wearing masks, before they left the union. He identified Shelby Robinson as the man holding the gun, and stated that Clarence Davis "appeare[d] to be the one with him." Vol. IV at 16. Collier estimated that from the time the two men entered the building until they ran out, only four to five seconds had elapsed.

That same morning, Melissa Sloan had driven to a park to meet Robinson, who was her boyfriend. Robinson had asked her to meet him there so he could give her money to pay an outstanding bill. Eventually, Sloan received a phone

call from Robinson, who was crying. He asked her to come and get him at a convenience store in the vicinity of the union. When Sloan arrived at the store, Robinson was not there, so she called him on his cell phone. Robinson instructed Sloan to pick him up near the expressway. Sloan testified that at the pick-up location Robinson and another man jumped out of some bushes and got into her vehicle. She stated that Robinson sat in the front passenger seat, bleeding badly, while the other man sat in the back seat. Sloan drove the two men to her home where they were picked up minutes later by someone else.

Sloan testified that she never got a good look at the person in the back seat,[1] but she overheard Robinson refer to him as "Pip, or something like that." Id. at 52-53. Davis's girlfriend, Jeana Kendricks, testified that Davis's nickname was "Peppy." Consistent with that testimony, Robinson's brother stated that Davis was often known as "Pep" or "Big Daddy."

According to Sloan, during the trip to her house, the man in the back seat grabbed her cell phone and used it. Phone records admitted at trial indicate that several phone calls were placed from Sloan's cell phone to Kendricks's cell phone between 9:51 a.m. and 10:09 a.m, right after the time of the robbery. Sloan

---

[1]     Law enforcement officers showed Sloan a photograph of Davis and she identified him as the individual in the back seat of her car. At trial, she retracted this statement and insisted that she was not comfortable identifying Davis as the man in the backseat of her car.

testified that she did not make any phone calls to Kendricks on April 13, or for that matter, she stated that she did not even know Kendricks. Likewise, Kendricks testified that she did not know Sloan. Other phone records admitted at trial established: (1) a call from Robinson's cell phone to Kendricks's cell phone at 7:35 a.m.; (2) four calls from Sloan's cell phone to Robinson's cell phone between 8:50 and 9:00 a.m.; (3) six calls from Robinson's cell phone to Sloan's cell phone between 9:17 a.m. and 9:50 a.m., (4) one call from Kendricks's cell phone to Sloan's cell phone at 10:29 a.m.; (5) one call from Kendricks's cell phone to Robinson's cell phone at 11:41 a.m; (6) one call from Kendricks's cell phone to Sloan's cell phone at 11:42 a.m.; and (7) one call from Robinson's cell phone to Kendricks's cell phone at 12:25 p.m.

In the days following the attempted robbery, law enforcement officers recovered a gun and a black coat hidden in a residential neighborhood close to the union, and found a long-sleeved t-shirt, a pair of gloves, a "do-rag," and a piece of a flannel shirt along the fence line of the expressway. A DNA analyst compared a buccal swab from Davis to a sample taken from the "do-rag" and found a match. Davis was approximately one in 31,000 African Americans with DNA matching the "do-rag" sample. This was a fairly low figure due, in part, to the fact that only a partial profile was obtained from the "do-rag."

Eight days after the robbery, an FBI agent interviewed Davis. Davis explained that for the past two weeks he had been working at a company named TCIM from eight in the morning until four in the afternoon. Later on in the interview, Davis changed his story and informed the FBI agent that he was at his girlfriend's house on the day of the robbery. A TCIM representative testified that Davis had neither worked at TCIM, nor interviewed for a position there.

## II.

### A. Sufficiency of Evidence

Davis contends that the evidence was insufficient to convict him of conspiracy to commit armed bank robbery and aiding and abetting an attempted bank robbery.

"We review sufficiency of the evidence claims de novo, asking only whether, taking the evidence–both direct and circumstantial, together with reasonable inferences to be drawn therefrom–in the light most favorable to the government, a reasonable jury could find [Davis] guilty beyond a reasonable doubt." United States v. Allen, 235 F.3d 482, 492 (10th Cir. 2000) (internal quotations omitted). "We do not question the jury's credibility determinations or its conclusions about the weight of the evidence." Id. "'The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt. Instead, the

evidence only has to reasonably support the jury's finding of guilt beyond a reasonable doubt.'" United States v. Pulido-Jacobo, 377 F.3d 1124, 1129 (10th Cir. 2004) (citation omitted).

To convict a defendant of armed bank robbery, the government has the burden to prove that (1) the defendant took, or attempted to take, money belonging to a bank, credit union, or any savings and loan association; (2) by using force and violence, or intimidation; (3) the deposits of the institution were federally insured; and (4) in committing or attempting to commit the offense, the defendant assaulted any person, or put in jeopardy the life of any person by the use of a dangerous weapon or device. 18 U.S.C. § 2113(a), (d); United States v. Wright, 215 F.3d 1020, 1028 (9th Cir. 2000).

Here, the government charged Davis with conspiring to commit armed robbery and aiding and abetting an attempted armed robbery. "With respect to the charge of conspiracy, the government was required to prove (1) an agreement between two or more persons to break the law, (2) an overt act in furtherance of the conspiracy's objects, and (3) that . . . [Davis] willfully joined in the conspiracy." United States v. Summers, 414 F.3d 1287, 1295 (10th Cir. 2005) (citing United States v. Shepard, 396 F.3d 1116, 1123 (10th Cir. 2005)). Under the aiding and abetting theory, "the government was required to demonstrate beyond a reasonable doubt that . . . [Davis] (1) willfully associated with the

charged criminal venture and (2) aided the venture through affirmative action." Id. (citing United States v. Delgado-Uribe, 363 F.3d 1077, 1084 (10th Cir. 2004)).

Davis cites this court's recent decision in United States v. Summers to argue that the evidence presented at his trial was insufficient to support his convictions. In Summers, we held that the evidence presented at trial was insufficient to support the defendant's convictions for aiding and abetting a bank robbery and conspiracy to commit bank robbery. 414 F.3d at 1291-92. Specifically, we held that the government's theory that Summers was the getaway driver at the bank and was a member of a conspiracy could be supported only by "piling inference upon inference." Id. at 1295. As to the aiding and abetting charge, we noted that no witnesses could positively identify Summers either before or after the robbery. Id. at 1296. As to the conspiracy charge, we concluded that there was insufficient evidence to adduce that Summers "willfully joined or participated in the conspiracy." Id. In particular, we observed that the government failed to produce evidence linking Summers to any post-robbery activities or establishing communication between Summers and his co-defendants prior to the bank robbery. Id. Additionally, we emphasized that the arresting officers failed to discover any evidence linked to the bank robbery on Summers' person. Id. In sum, we determined that Summers' mere presence with the other co-defendants in the getaway car was insufficient to support his convictions. Id.

Davis's challenge to his conspiracy conviction closely follows our reasoning in Summers. He argues that the evidence was insufficient to show that he willfully joined or participated in the conspiracy. Davis acknowledges that the jury may have inferred his presence in the area of the robbery, but he maintains that this alone was insufficient because "there was simply no evidence to link . . . [him] to the robbery itself." Aplt. Br. at 34. He characterizes the DNA evidence linking him to the "do-rag" as weak, and contends that no witness clearly identified him. Davis again relies on Summers to contend that the government failed to produce evidence establishing communication between him and Robinson prior to the attempted robbery, and he believes it to be significant that "officers failed to discover any evidence linked to the bank robbery on . . . [his] person." Id.[2]

For Davis to argue that the evidence in this case was insufficient to convict borders on being frivolous. Unlike Summers, there is strong evidence establishing that Davis was Robinson's accomplice. Collier positively identified Davis at trial. Sloan did as well, even though she attempted to retract her earlier identification to police. Sloan also testified that Robinson referred to the man in

_____

[2]     Apparently, Davis relies on these same arguments to challenge the government's aiding and abetting theory because he fails to assert any separate arguments for that conviction.

the back seat of her car as "Pip," and the evidence at trial demonstrated that Davis used the nicknames "Pep" and "Peppy." Arguably, the strongest identification evidence comes from phone records. Sloan testified that the man in the back seat used her phone while she was driving both men to her home. Sloan's phone records reflect that shortly after the attempted robbery, several phone calls were made from her cell phone to Davis's girlfriend, Kendricks. The evidence also established that Kendricks and Sloan did not know each other. The remainder of the phone records show numerous phone calls made between the cell phones of Sloan, Robinson, and Kendricks on the morning of the robbery. While this evidence alone is sufficient, DNA evidence also tied Davis to the "do-rag" found in the vicinity of the credit union. This is not a case of piling inference upon inference. There is more than ample direct and circumstantial evidence to support Davis's convictions for conspiracy to commit an armed bank robbery and aiding and abetting an attempted armed bank robbery.

B. False Alibi and Jury Instruction Regarding False Exculpatory Statements

Davis argues that the district court erred by admitting an FBI agent's testimony concerning Davis's statements to the agent and instructing the jury regarding false exculpatory statements.

We review a district court's ruling on the admissibility of evidence for an abuse of discretion. United States v. Serrata, 425 F.3d 886, 901 (10th Cir. 2005).

Under this standard, we will not reverse a trial court's evidentiary rulings unless we are convinced the district court "'made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" Id. (citation omitted).

We also review de novo whether, as a whole, the district court's instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards. United States v. Cerrato-Reyes, 176 F.3d 1253, 1262 (10th Cir. 1999) (citation omitted). "An instructional error is harmless unless the error had a substantial influence on the outcome of the trial or if the court is left in grave doubt as to its influence." United States v. Cota-Meza, 367 F.3d 1218, 1221 (10th Cir. 2004) (citation omitted).

At trial, FBI agent Matt Lotspeich testified, over objection, about an interview he conducted with Davis eight days after the robbery. Vol. V at 205, 212. According to Agent Lotspeich, Davis informed him that he was employed at a company called TCIM, and that he had been working there for the previous two weeks between 8 o'clock and 4 o'clock. Id. at 228. Agent Lotspeich testified that during the interview Davis changed his story, and explained that he was not at work at the time of the robbery, but was at his girlfriend's house. Id. at 229.

The government argued before the district court that Davis's evolving statement to Agent Lotspeich–that he was at work at the time of the robbery and

-11-

then that he was actually at his girlfriend's house–constituted a voluntary, false exculpatory statement. The government maintained that it was entitled to exploit the false statement, call a witness from TCIM to prove that it was false, and to obtain an instruction about consciousness of guilt. Id. at 213. The district court allowed Agent Lotspeich's testimony, as well as a TCIM representative's testimony that Davis had neither worked at TCIM, nor interviewed for a position there. Over objection, the district court also gave the following jury instruction on false exculpatory statements:

> When a defendant voluntarily and intentionally offers an explanation, or makes some statement before trial tending to show his innocence, and this explanation or statement is later shown to be false, you may consider whether this evidence points to consciousness of guilt. The significance to be attached to any such evidence is a matter for you to determine.

Vol. I, Doc. 96.

On appeal, Davis again maintains that the government improperly asked Agent Lotspeich about an alibi statement that he never raised as a defense. Specifically, Davis challenges the government's use of Agent Lotspeich's testimony to make it appear that Davis relied on a false alibi, and then to call another witness to demonstrate that Davis was not at work that day. Davis asserts that his statement that he was at work was an example of thinking out loud and that he merely had trouble remembering where he was on the day of the robbery. He argues that his statement did not rise to the level of a false alibi.

-12-

Davis contends that the district court's error in admitting the testimony was compounded by the jury instruction given on false exculpatory statements.

We conclude that the district court did not abuse its discretion in admitting the challenged testimony to prove consciousness of guilt. Although false exculpatory statements "cannot be considered by the jury as direct evidence of guilt," such statements "are admissible to prove circumstantially consciousness of guilt or unlawful intent." United States v. Zang, 703 F.2d 1186, 1191 (10th Cir. 1982) (citations omitted). The jury was entitled to weigh the evidence and decide whether Davis fabricated a story as to his whereabouts on the date of the robbery, or just momentarily could not remember. See United States v. Ingram, 600 F.2d 260, 262 (10th Cir. 1979) (concluding that it was proper to give an instruction regarding false exculpatory statements when the defendant informed FBI agents that "though he wasn't sure, he believed that he was at Fort Carson, Colorado on the day of the robbery" and the government established at trial that the statement was incorrect). We conclude that the district court's instruction to the jury about false exculpatory statements was supported by the evidence and is an accurate statement of the law. The instruction "leaves exclusively to the jury the question as to whether false exculpatory statements, if made, indicate consciousness of guilt, or nothing at all." Id.

C. Reasonableness of Sentence

-13-

Davis argues that his 360 month sentence was unreasonable in light of the Supreme Court's decision in Booker. First, Davis emphasizes the disparity between his sentence and that of his co-defendant, Robinson. Davis paints himself as the less culpable of the two, stressing that Robinson possessed the firearm during the robbery and was a fugitive in another state for a period following the robbery. Davis asserts that the district court's sentencing discretion, as well as common sense, dictates that his sentence should be similar to Robinson's 155 month sentence. Second, Davis contends that the district court treated the guidelines as de facto mandatory. Lastly, Davis maintains that he could not reasonably be designated as a career offender after Booker.

"We now review sentences imposed after Booker for reasonableness." United States v. Morales-Chaires, 430 F.3d 1124, 1128 (10th Cir. 2005) (citing Booker, 125 S.Ct. at 766). Based on a total offense level of 37 and a criminal history category of VI, the presentence report calculated Davis's guideline range to be 360 months to life imprisonment. Here, the district court carefully explained its reasons for imposing a 360-month sentence:

> In determining an appropriate sentence in this case, the Court has reviewed and considered the nature and circumstances of the offense as well as the characteristics and criminal history of the defendant. Further, the Court has taken into consideration the sentencing guideline calculations contained within the Presentence Report, the objections to the presentence report, your arguments for a sentence below the applicable guideline range, some revisions made to the report, and the Court's findings announced in open court

-14-

today. Consistent with the Supreme Court decision in <u>United States v. Booker</u>, the Court recognizes it is not bound by the sentencing guideline range calculations contained within the pre-sentence report, but have considered them and find them to be advisory in nature.

Pursuant to 18 U.S.C. § 3553(a), there are several factors that warrant the specific sentence imposed in this case. That is, the defendant's extensive criminal history, the violent nature of the offense, and the applicable advisory guidelines that classify defendant as a career offender. The sentence prescribed by this Court reflects the seriousness of the offense, promotes respect for the law and provides just punishment for the offense. This sentence affords adequate deterrence to criminal conduct, protects the public from further crimes of this defendant and provides correctional treatment for the defendant in the most effective manner.

Vol. II.

Davis's sentence disparity argument lacks merit. "While similar offenders engaged in similar conduct should be sentenced equivalently, disparate sentences are allowed where the disparity is explicable by the facts on the record." <u>United States v. Goddard</u>, 929 F.2d 546, 550 (10th Cir. 1990) (internal citation and citation omitted); <u>see also</u> 18 U.S.C. § 3553(a)(6) (providing that a district court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"); <u>United States v. Gallegos</u>, 129 F.3d 1140, 1143 (10th Cir. 1997) (stating that "the purpose of the guidelines is to eliminate unwarranted disparities in sentencing nationwide, not to eliminate disparity between co-defendants") (citations, quotations, and brackets omitted). Put another way, a criminal defendant alleging a disparity between his sentence and that of a co-defendant is not entitled to relief

from a sentence that is properly within the sentencing guidelines and statutory requirements. United States v. Blackwell, 127 F.3d 947, 951-52 (10th Cir. 1997). As the government points out, the reason for Davis's lengthy sentence was his career offender status. Without this classification, Davis's total offense level would have been 26, with a criminal history category of VI, resulting in a guideline range of 100-125 months. This guideline range would be quite comparable to Robinson's ultimate 155 month sentence.

Davis's belief that the district court treated the guidelines as de facto mandatory simply because it did not impose a sentence below the guideline range is not persuasive. The district court's statements reflect that it thoroughly considered both the applicable sentencing guidelines and the sentencing factors enumerated in § 3553(a) before imposing a sentence at the bottom of the advisory guideline range.

We further conclude that the district court properly designated Davis as a career offender. "Whether a defendant was erroneously classified as a career offender is a question of law subject to de novo review," United States v. Mitchell, 113 F.3d 1528, 1532 (10th Cir. 1997), but we review the district court's factual findings supporting a sentence enhancement for clear error, United States v. Farrow, 277 F.3d 1260, 1262 (10th Cir. 2002). Under U.S.S.G. § 4B1.1, a defendant is a career offender if:

(1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1. First, the government submitted certified documentation to the district court establishing that Davis was over eighteen years old at the time of the armed robbery. Vol. VII at 7. Second, there can be no dispute that attempted armed robbery is a "crime of violence" under U.S.S.G. § 4B1.2(1)(a). As to the final element, the presentence report, pursuant to § 4B1.1(b)(B), raised Davis's offense level from 26 to 37 based on his prior convictions of possession of cocaine with intent to distribute, unlawful possession of marijuana with intent to distribute, and assault and battery on a peace officer. The government listed these same convictions in count five of the second superceding indictment (felon in possession of a firearm) as prior convictions "punishable by imprisonment for a term exceeding one year." Vol I, Doc. 69, at 6.[3] It is apparent that these felony convictions under Oklahoma law constitute "crimes of violence" or "controlled substance offense[s]" under U.S.S.G. § 4B1.2(1)(a) and (b). Davis's criminal history qualified him for career offender status, and thus, we reject any notion

---

[3] At trial, Davis stipulated that he had been previously convicted of felony crimes punishable for a term exceeding one year for the limited purpose of establishing an essential element to his felon in possession of a firearm charge. Vol. V. at 131.

that the district court unreasonably applied the applicable guidelines. We conclude that there is nothing in the record to suggest that Davis's 360 month sentence was unreasonable.

D. Sixth Amendment

Finally, Davis contends that the district court violated the Sixth Amendment when it enhanced his sentence based on his career offender status, i.e., his three prior felony convictions, which were not charged in the indictment, nor proven to a jury beyond a reasonable doubt. Davis acknowledges that this issue is foreclosed by current Supreme Court and Tenth Circuit precedent. He raises the issue only to preserve it for possible Supreme Court review.

This court has held post-Booker that the existence and classification of prior convictions used to enhance a defendant's sentence need not be charged in the indictment and submitted to a jury. See United States v. Moore, 401 F.3d 1220, 1224 (10th Cir. 2005) ("[W]e are bound by existing precedent to hold that the Almendarez-Torres[4] exception to the rule announced in Apprendi[5] and extended to the Guidelines in Booker remains good law . . . . We therefore conclude that the government need not charge the 'fact' of a prior conviction in an indictment and submit it to a jury."); United States v. Small, 423 F.3d 1164,

---

[4]    Almendarez-Torres v. United States, 523 U.S. 224 (1998).

[5]    Apprendi v. New Jersey, 530 U.S. 466 (2000).

-18-

1188 (10th Cir. 2005) (holding that the district court's career offender findings under § 4B1.1 did not implicate the Sixth Amendment, and that "whether the present offense and prior offense constitute felonies that are crimes of violence or controlled substance offenses are questions of law unaffected by the Supreme Court's holding in Booker"). Accordingly, we reject Davis's Sixth Amendment argument.[6]

Davis's convictions and sentence are affirmed.

---

[6] We note that Davis never stipulated that he achieved the age of majority before committing the offense of conviction–a fact necessary to qualify for career offender status. At sentencing, the government submitted evidence to the district court to establish that Davis was eighteen years old at the time of the armed robbery. Vol. VII at 7. Davis argued to the district court, Vol. I, Doc. 104, at 4-5, and to some extent on appeal, Aplt. Br. at 29, that post-Booker his age must be charged in the indictment and submitted to the jury. While Booker is implicated because the district court, not the jury, found that Davis was eighteen when he committed the armed robbery, United States v. Small, 423 F.3d at 1188, we agree with the Seventh Circuit that a defendant who fails to assert that he was under eighteen years old at the time of offense will not prevail on this claim under either plain or harmless error review, United States v. Pittman, 418 F.3d 704, 710 (7th Cir. 2005). Similar to the defendant in Pittman, Davis does not contend that he was less than eighteen at the time of the armed robbery, i.e., that the result would have been different if the jury, not the judge, determined his age.