FILED
United States Court of Appeals
Tenth Circuit

**March 30, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CHARLES E. CALDWELL, JR.,

Defendant - Appellant.

No. 07-6251

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 5:06-CR-00264-HE-4)**

---

Alleen Castellani VanBebber, McDowell, Rice, Smith & Buchanan, P.C., Kansas City, Missouri, for Defendant - Appellant.

Susan Dickerson Cox, Assistant United States Attorney, (John C. Richter, United States Attorney, with her on the brief), Oklahoma City, Oklahoma, for Plaintiff - Appellee.

---

Before **HARTZ**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **McCONNELL**, Circuit Judge.

---

**HARTZ**, Circuit Judge.

---

Charles E. Caldwell Jr. was convicted on three counts of using wire communications in similar schemes to defraud mortgage lenders. *See* 18 U.S.C.

§ 1343 (wire-fraud statute). The charges arose out of his role as a mortgage broker on loans for three homes while he worked for a business called United Lending. By providing false and incomplete information to the lenders, each purchaser obtained a loan for more than the home's sale price. Mr. Caldwell's appeal raises four challenges to his convictions: (1) the evidence was insufficient to show his intent to defraud; (2) the court erroneously admitted evidence of mortgage loans not charged in the indictment; (3) his trial was improperly joined with that of three codefendants; and (4) the district court improperly denied his motion to sever his trial from that of his codefendants. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

At the time of trial Mr. Caldwell was 41 years old. He had received a degree in business management from the University of Central Oklahoma and had been working as a pharmaceutical representative for 14 years. Because that job primarily involved visiting doctors' offices (to explain the virtues of his employer's drugs), Mr. Caldwell's work hours were flexible. He therefore was able to work as a mortgage broker on the side.

A fraternity brother introduced Mr. Caldwell to the mortgage-lending business. His friend worked for Skyline Mortgage, a mortgage broker that earned commissions from mortgage lenders by acting as an intermediary between the lender and the borrower. In the evenings Mr. Caldwell would go by Skyline and

the friend would explain the business. Mr. Caldwell began working part-time for Skyline in late 2002. Because of his sales background, his main task at Skyline was to "go out and get business." R., Trial Tr. Vol. 11 at 1978.

After a few months Mr. Caldwell moved from Skyline. He signed an employment agreement with United Lending in April 2003 and began part-time work there in July. Anthony Jew, the manager of United Lending, enticed him to come to United Lending by offering a 65% share of United Lending's commission if he generated the customer; Skyline paid its brokers only 35% of its commission. United Lending also paid 50% of its commission even if the customer was obtained through a lead generated by United Lending, such as by a Yellow Pages advertisement.

United Lending had been founded in 2003. Mr. Jew's wife, Linda, was the owner. During the pertinent time there were nine people at United Lending: Mr. and Mrs. Jew and seven loan officers. (There was no mention during trial of any clerical employees.)

At United Lending Mr. Jew continued to train Mr. Caldwell in the methods of the mortgage-lending industry. Additionally, because Oklahoma then required mortgage brokers to be licensed, Mr. Caldwell took and passed a 1½ day course, becoming a licensed mortgage loan originator in June 2003.

Mr. Caldwell's wife, Gayle, also worked as a pharmaceutical representative. Although she did not become a mortgage broker, she paid Mr. and

Mrs. Jew $500 in September or October of 2004 to acquire a company named Access Marketing Services, Inc., which loaned home buyers money to make down payments.

Mr. Caldwell, Mrs. Caldwell, and five codefendants were charged in a 14-count indictment handed down in November 2006 in the United States District Court for the Western District of Oklahoma. The charges arose out of mortgage loans for six homes in the Oak Tree subdivision in Edmond, Oklahoma, between 2003 and 2005. Mr. Caldwell was charged with respect to three of the loans.

The defendants' fraudulent scheme enabled persons with weak credit to obtain loans that paid the entire purchase price of the homes and gave them money back besides. We will summarize the scheme now, but our discussion of the evidence of Mr. Caldwell's fraudulent intent will be largely postponed until we address the sufficiency of the evidence of guilt.

The central figure in the offenses was Brandon Baum, who acted as the real-estate agent for the buyers. Baum would prepare a purchase agreement that would provide the asking price to the seller, but in a deceptive fashion that was essential to defrauding the mortgage lender. The agreement inflated the sale price of the home (by what we will call the Excess Amount) but contained an addendum that required the seller to pay that Excess Amount to a contractor to perform repairs or remodeling work on the home. Most of the time the contractor was specifically named, but the named company was a sham, merely a bank

account used to funnel money.  (Apparently the sellers did not know of the sham.) The purchase agreement was provided to the mortgage lender, but without the addendum.  Although the lender required the purchaser to make a down payment on the home purchase, Baum and his associates paid all or most of the down payment for the purchaser.  The loan application falsely stated that the down payment had not been paid with borrowed funds.  At closing the Excess Amount was distributed to the sham contractor out of the loan proceeds; that money was then used to repay those who had made the down payment.  Also, the Excess Amount usually sufficed to give the purchaser cash for other purposes.

The mortgage lender was defrauded because (1) it was not informed of the true price of the home (the Excess Amount addendum not having been provided to the lender), and (2) it was falsely told that the purchaser had not borrowed the down payment.  In addition, the loan applications often contained false information about the buyer's financial condition.  Representatives of the lenders testified that they would not have made the loans if they had seen the addenda or known of the down-payment loans.

Apparently Mr. Caldwell's first transaction with Baum was for the purchase of a home by the Caldwells on August 29, 2003, with Baum serving as their real-estate agent.  No criminal charges were filed with respect to the mortgage loan for that purchase, although it bore several significant similarities to the charged transactions:  The Caldwells borrowed most of their down payment from Baum

and his associates but their application stated that the down payment was not borrowed. Also, the purchase agreement stated a price above the seller's listed price, and the excess eventually was paid to the Caldwells, providing them with funds to repay the down-payment loan and leaving them more than $12,000 extra. The seller's agent was Ann Campbell, who represented several of the sellers in the charged transactions.

The first two charged transactions followed shortly thereafter. They involved Joseph Conrad Therrien and Dalton Alford, who had been sharing a home owned by Alford in Mr. Caldwell's neighborhood. Therrien and Alford were also business partners in a failing local nightclub called Rane. Mr. Caldwell arranged for Jew to meet Baum, Therrien, and Alford on September 4, 2003. According to Mr. Caldwell, "from that point on [Therrien and Alford] dealt with [Jew]." R., Trial Tr. Vol. 11 at 1983.

Both Therrien and Alford obtained mortgage loans brokered by United Lending for which Mr. Caldwell was designated as the loan officer. The first loan was for Therrien's purchase of 1000 Irvine Drive. Baum was Therrien's real-estate agent. The seller listed the property at $335,000. Baum, however, provided the seller with a purchase agreement that set the price at $405,000 and contained an addendum requiring the sellers to give $60,000 after closing to Alliance Construction for remodeling. Alliance Construction was a sham. It was

not a company, but instead just one of several names on a bank account for which Toney Mykel, a friend of Baum's, was the signatory.

To purchase the home, Therrien had to make a down payment of $22,250. All but $2,000 of this sum came from Baum and his associates. Included was a $3,000 cashier's check payable to Therrien, purchased by Mr. Caldwell on October 9, the day before closing.

On the loan application submitted to the mortgage lender, Argent Mortgage, Therrien stated that he did not borrow any portion of the down payment. He also overstated his income. The purchase agreement was forwarded to Argent, but without the addendum regarding the sham remodeling.

At the October 10 closing, $60,000 was disbursed to Alliance Construction, as required by the addendum. Mykel, the signatory on the fake company's account, disbursed $38,750 to Alford for the nightclub he owned with Therrien. On October 15 Mykel purchased a cashier's check payable to Mr. Caldwell for $3,000 as repayment for the money he had loaned a few days earlier. In addition, Mr. Caldwell received from United Lending a $7,502.63 commission on the transaction.

Alford purchased 5916 Morning Dove Lane a week after Therrien's closing. Baum was also Alford's real-estate agent; the seller's agent was Campbell. The owner's list price was $235,000. But, again, the purchase agreement prepared by Baum inflated the price, setting it at $310,000 and

requiring the seller after closing to pay $77,500 to Alliance Construction for remodeling. Alford borrowed $19,132.59 from Baum and Mykel for his down payment.

The loan application signed by Alford stated that no part of the down payment had been borrowed and overstated Alford's income. Also submitted to the mortgage lender, Argent Mortgage, was a completed "Request for Verification of Rent or Mortgage" form. Although Alford owned his own home, the form stated that Alford had been renting from Therrien for nearly three years. In addition, Argent received a copy of the purchase agreement but absent the remodeling addendum.

At closing, Alliance Construction received $77,500 of the loan proceeds. Mykel later disbursed most of this Excess Amount, giving $10,250 to Baum and $58,750 to Alford. Mr. Caldwell received a $5,742 commission from United Lending.

The third charged transaction related to the purchase of 1709 Irvine Drive in January 2005. Baum was the real-estate agent for the purchaser, Fenella Balang. Jew introduced Balang to Mr. Caldwell, who was named as the loan officer on her application. Initially, the seller, who was represented by real-estate agent Campbell, had listed the property at $575,000 and then reduced the asking price to $550,000. But the purchase agreement gave a sale price of $800,000 and included an addendum requiring the seller to pay $220,000 after closing: (1)

$88,000 to the "Windsong Program," a program that the seller was led to believe would allow the purchaser to build repairs into the home's purchase price; and (2) $132,000 to "escrow for repairs to be done after close." Add. to Br. of Pl.-Aplee. (Gayle Caldwell) at 221. To make her down payment, Balang borrowed $120,000 from ProSpect Marketing Services.

As in the two other charged transactions, key elements of the transactions were not disclosed to the lender, which in this instance was Long Beach Mortgage Company. Long Beach did not receive the addendum. And Balang's loan application stated that she had not borrowed any portion of the down payment.

At closing, ProSpect Marketing received $128,050 as a repayment plus commission for the $120,000 down-payment loan. The title company handling the closing also disbursed $92,000 to Secorum Investments, LLC—another sham construction company set up by Baum—which in turn paid the full amount to Balang. A third recipient of funds at closing was Access Marketing, the down-payment-assistance company that Gayle Caldwell had bought from Mr. and Mrs. Jew. Access Marketing received $10,000 as a "marketing service" fee." Add. to Br. of Pl.-Aplee. (Gayle Caldwell) at 278. From that sum Mr. Caldwell received a $4,500 check, signed by his wife, whose memo line stated, "Blain File-Referral Fee," *id.* at 239, apparently a misspelled reference to Balang. Mr. Caldwell also received a commission of $15,847.50 from United Lending.

We now address in turn Mr. Caldwell's four challenges to his conviction: (1) insufficiency of the evidence of intent to defraud, (2) improperly admitted evidence of uncharged misconduct, (3) improper joinder, and (4) failure to sever his trial from that of his codefendants.

## II.    DISCUSSION

### A.    Sufficiency of the Evidence

We review the evidence de novo to determine whether a reasonable jury, viewing the evidence in the light most favorable to the prosecution, could find Mr. Caldwell guilty beyond a reasonable doubt.  *See United States v. Gallant*, 537 F.3d 1202, 1222 (10th Cir. 2008).

"To convict a defendant of wire fraud under 18 U.S.C. § 1343, the government must show (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) . . . use of interstate wire . . . communications to execute the scheme." *Id.* at 1228 (internal quotation marks omitted).  The wire transfer for each wire-fraud count was the transfer of money from the mortgage lender to the title company handling the closing.

Mr. Caldwell's challenge to the sufficiency of the evidence is a limited one. He does not dispute that the mortgage lenders were defrauded.  Nor does he dispute that he was the listed loan officer and had a role with regard to each of the loans.  What he argues on appeal, as he testified at trial, is that he simply did not

-10-

know of any fraudulent conduct. He contends that his role was essentially to get customers for United Lending. Because he continued his full-time job as a pharmaceutical representative, he said, he was only in the United Lending office late in the day and the fraudulent paperwork was handled by others. The jury, however, did not believe this story, and it had ample evidence to reach that conclusion.

To begin with, we observe that Mr. Caldwell was no babe in the woods. He had a college degree in business administration, had been earning $80,000 a year as a pharmaceutical representative touting drugs to neurologists, and received training in mortgage lending from his fraternity brother, from United Lending, and from a course that qualified him as a licensed mortgage loan originator.

A reasonable jury could readily infer that someone of Mr. Caldwell's education, training, and experience would understand that a lender needs to be fully informed regarding a potential borrower's financial condition and the value of the loan's collateral. In particular, he would know that the lender should not be deceived about the true sales price of the home and the borrower's wherewithal to make a down payment.

The jury could also easily infer that Mr. Caldwell was too sophisticated to believe that he could earn a 65% commission solely by bringing in a customer and leaving the rest of the work to others. He earned $7,503 on the Therrien loan, $5,742 on the Alford loan, and $15,848 on the Balang loan, all, he claims, just for

bringing in the client. To be sure, the trial testimony suggested that obtaining customers was important; but bringing in the customer raised the commission only from 50% (for being the loan officer of a customer obtained through Yellow Pages advertising) to 65%. If working with a customer to consummate the transaction was worth a 50% commission, then the solicitation by itself (without follow-up work) should be worth only about a 15% commission. As Jew testified, if Mr. Caldwell was not handling any of the paperwork (an assertion by Mr. Caldwell that Jew disputed), "I really overpaid him." R., Trial Tr. Vol. 10 at 1644. Moreover, as we shall see, one could question whether Mr. Caldwell could properly be described as the one who obtained the customer—certainly he did not bring Balang to United Lending. And it is unclear who would have performed the work for Mr. Caldwell. Neither he nor Mr. Jew mentioned a clerical staff at United Lending; and it would not be in the interest of other loan officers to assist him for free, although a friend of Mr. Caldwell's, Billy Nichols, was originally hired to assist Mr. Caldwell with paperwork.

Another important element of the background to the charged offenses is the mortgage-loan transaction for the Caldwell's purchase of their own home, which occurred about a month before the first two charged transactions and shared several significant features with all three charged transactions. First, the sales price was inflated on the purchase agreement. The home purchased by the Caldwells through their real-estate agent, Baum, was listed by the seller (whose

agent was Campbell) at $320,000, but the purchase agreement stated the price at $350,000 (a $30,000 Excess Amount). Second, much of the down payment was borrowed. The Caldwells borrowed $17,914.14 of their $19,255.59 down payment from Baum and associates of his. Third, the loan application said that the down payment was not borrowed. Fourth, the $30,000 Excess Amount was forsaken by the seller after closing, eventually being used to repay the down-payment loan and leaving the Caldwells with a net of $12,258. To be sure, Mr. Caldwell testified at trial that he did not know that the application form denied a down-payment loan (his wife, not he, had signed the form), and he testified that he thought that the $12,258 was the refund of an overcharge. But the jury could find it hard to believe that he was ignorant of such important components of the transaction, particularly when he was the mortgage broker in the family. And he did sign the purchase agreement with the inflated price, as well as the closing statement. Not only would a jury inference of his knowledge of those components support an inference that he knew about similar components in the charged transactions, but the jury could also infer that his false denial of his knowledge of his own mortgage-loan transaction suggested his consciousness of guilt. *See United States v. Davis*, 437 F.3d 989, 996 (10th Cir. 2006) ( "[F]alse exculpatory statements . . . are admissible to prove circumstantially consciousness of guilt or unlawful intent." (internal quotation marks omitted)).

There is also more specific evidence that Mr. Caldwell's involvement in the charged transactions was significantly greater than he admitted. Mr. Caldwell testified that his involvement with the loans to Therrien and Alford was minimal. He said that Baum had promised to bring him business to make up for what Mr. Caldwell described as an awful experience in obtaining his own mortgage loan and that Baum, in keeping with the promise, had brought Therrien and Alford to him. Mr. Caldwell asserted that he in turn merely introduced them to Jew, who took things from there.

But Jew contradicted Mr. Caldwell's account. He agreed that he had met with Therrien and Alford without Mr. Caldwell's being present. But he said that he came back from that meeting with loan applications from both Therrien and Alford and turned the matter over to Mr. Caldwell. Although he handled additional matters when Mr. Caldwell was unavailable, it was Mr. Caldwell who did most of the work and dealt with the mortgage lender, Argent. Indeed, Jew testified that early in the morning of September 5, 2003, the day after delivering the applications to Mr. Caldwell, who entered the information in the United Lending computer, Jew left town for over a week and could not have assisted in the paperwork.

Especially incriminating is Mr. Caldwell's participation in the down-payment loan to Therrien. (Therrien denied on his loan application that he had received a down-payment loan.) As previously noted, Mr. Caldwell purchased a

$3,000 cashier's check made out to Therrien on October 9, the day before the loan closed. The money was used for the down payment on the home. Mr. Caldwell was reimbursed for the $3,000 on October 15 with a cashier's check naming Mykel as the remitter. Mr. Caldwell, who admitted at trial that it would be improper for a loan officer to make a personal loan to a customer, provided an explanation that defies belief. He claimed that the $3,000 check to Therrien was really a loan to Baum. He testified:

> Q. And how did you come to . . . have 3,000 bucks . . . show up in this transaction?
>
> A. I came back from work one day and pulled up in the parking lot and [Baum] was there. He said, you are just the guy I wanted to see. I said, what's up? And he said, I owe [Therrien] some money and I need to pay him. I said, okay, what does that have to do with me? And he's, like, I need you to loan me some money so I can pay [Therrien] his money. I said, okay, how much are we talking about? He said $3,000. I said, [Baum], I need my money back. He said, don't worry, I've got some deals that are closing, within the next couple of days I'll pay your money back. We go to the bank, I got the 3,000 out, and he says, you know what, I don't have time to go by the bank. And he asked the girl, can we just get this cashier's check made out to [Therrien]. . . . And I'm like, I don't – I don't have a problem with it. I'm loaning to him, I don't know the guy. So that's exactly what happened.

R., Trial Tr. Vol. 11 at 1990–91. Mr. Caldwell further testified that he had not noticed at the time that the $3,000 repayment was a check from Mykel, rather than Baum. The jury could reasonably infer not only that Mr. Caldwell knowingly loaned Therrien $3,000 toward his down payment but also that

Mr. Caldwell's lying about the matter showed a consciousness of guilt. *See Davis*, 437 F.3d at 996.

With respect to the Alford loan as well, specific evidence shows that Mr. Caldwell's involvement was more than just setting up the meeting of Jew with Baum, Therrien, and Alford. Again, Jew testified that Mr. Caldwell handled the matter, particularly the contacts with Argent, the mortgage lender, including faxing the application, which attached the purchase agreement but not the Excess Amount addendum. Mr. Caldwell's handwriting appears on Alford's loan application.

One document in particular, though, establishes Mr. Caldwell's involvement in the loan and suggests his fraudulent intent—namely, Alford's verification-of-rent form. The form stated that Alford had been renting from Therrien for nearly three years and contained a hand-printed statement signed by Therrien, saying: "Dalton Alford has been a great tenant always punctual on the rent, and is a clean and tidy renter. Wish more of my renters were of his calibore [sic]." Add. to Br. of Pl.-Aplee. (Gayle Caldwell) at 23. Mr. Caldwell signed the form although he admitted knowing when he signed it that the form was false because Alford owned the home. Mr. Caldwell's explanation at trial was that he filled out and signed the form only because Jew instructed him to and that the falsity was of no importance because the mortgage lender is supposed to check out the matter itself. He testified:

I knew—it's a Request for Verification. You're not validating anything. All you're doing is requesting from the customer that they go get their rent verified. It's not a binding document. . . . You do understand that's not a binding document? All you're doing is requesting from the landlord that they verify the rent. The lender—that's why the phone number is listed, the lender calls to check and make sure that's where they live. They go and check on the county assessor's website, they check and make sure Dalton Alford owns that property.

R., Trial Tr. Vol. 12 at 2095. Rather than being reassured by this explanation, the jury could infer that Mr. Caldwell was simply a liar and a cheat.

As for the Balang transaction, Mr. Caldwell again claimed only a minimal involvement. He testified:

The first time [Balang] came into the office [Jew] asked me to—Fenella Balang had previously bought a property through United Lending, and [Jew] said print off her 1003, which is the Uniform Residential Loan Application everybody keeps referring to. He said print off [Balang]'s 1003 and bring it to me. I printed off the 1003, took it in there. [Balang] was in [Jew]'s office. He said, scan through this information, to make sure everything is still the same. She scanned through the information, he said, here, sign this. I signed the document, and from that point on she dealt with [Jew] the entire time.

*Id.* Vol. 11 at 2001.

But there was evidence of his substantial participation in brokering the loan. To begin with, it is hard to understand why the very limited amount of work that he described—particularly when he did not even obtain the customer—entitled him to 65% of United Lending's commission, earning him a hefty $15,847.50. In addition, Jew testified that Mr. Caldwell handled the loan.

-17-

And Jew is corroborated by what happened at closing. When Jew and Mr. Caldwell arrived at the title company's office, the seller greeted Mr. Caldwell with fury, pointing his finger at Mr. Caldwell. Jew's account of this incident was confirmed by the testimony of Pamela Harden, the title company employee who handled the closing. Whatever caused the seller's anger, it was obviously Mr. Caldwell, not Jew, who had been the seller's contact at United Lending.

Moreover, there is evidence that Mr. Caldwell knew of the down-payment loan to Balang, even though he signed the application form saying that the down payment was not borrowed. Balang needed a $120,000 loan for her down payment. Jew testified that he asked Mr. Caldwell if his wife's company, Access Marketing, would make the loan and that Mr. Caldwell said no, because the amount was too large. Jew then contacted ProSpect Marketing, which made the loan.

Mr. Caldwell testified to a different version of events:

Q. And you signed the [loan application] that had on there the source of down payment was checking and savings and that no part of the down payment was borrowed, didn't you?

A. Yes. I signed it.

Q. And you knew that wasn't true?

A. No, I did not.

Q. Well, you knew because Anthony Jew had asked you to provide the down payment assistance on the property first?

-18-

A. No, he didn't.

Q. He didn't ask for Access Marketing to be involved at first?

A. Okay. Once again, Gayle Caldwell owns Access Marketing, not Chuck. He didn't ask me to do anything.

Q. He asked your wife, didn't he?

A. You would have to ask my wife.

*Id.* Vol. 12 at 2117–18. A few minutes earlier, however, Mr. Caldwell's testimony seemed to indicate that he knew of the request. He said:

> Anthony Jew called Gayle and asked her if she could do the down payment for 120,000 and she started laughing. There was no way, we don't have that type of money. And he asked if she knew someone that could. . . . [S]he referred him to ProSpect Marketing.

*Id.* Vol. 11 at 2009.

The jury could also doubt that Mr. Caldwell was kept uninformed by his wife about Access Marketing's activities, because it heard of his involvement with Access Marketing with respect to an earlier, uncharged mortgage loan to Decell Lewis. After Access Marketing loaned Lewis $17,267.87 for his down payment, the company received a $113,155.07 check at closing for a "Marketing Service Fee." Mr. Caldwell endorsed the check and later received from Access Marketing a check to him for $16,000 out of those proceeds. Mr. Caldwell testified that the $16,000 was repayment of his "investment" in the company. *Id.* Vol. 10 at 2110.

-19-

Finally, we mention one more item that indicates Mr. Caldwell's knowledge of the fraudulent aspects of the mortgage loans. In March 2005, two months after the Balang loan, the title company that had handled closings for United Lending announced that it would no longer process closings in which proceeds were to go to "marketing fees." (The closing statement for Balang provided for "marketing fees" to Access Marketing and ProSpect Marketing, and the closing statement for Lewis provided for such a fee to Access Marketing.) A meeting was arranged for Mr. Caldwell and Mr. and Mrs. Jew to discuss this policy change with Pamela Hardin, the title-company employee who had been taking care of the closings. She testified at trial that Mr. Caldwell and Mr. Jew told her that the fees were for down-payment loans. She responded to them that she could close the transactions if the mortgage lender signed a form acknowledging that the fees were for down-payment assistance. Mr. Caldwell and Mr. Jew told her that the lenders were aware of the down-payment assistance. The jury could reasonably infer from this conversation that Mr. Caldwell, contrary to his testimony, had known of the down-payment loans for each of the charged transactions. Also, the jury could infer Mr. Caldwell's consciousness of guilt from his lying under oath that he did not know of the down-payment loans and from his falsely telling Ms. Hardin that the lenders knew of those loans (representatives of the lenders testified that they did not know). *See Davis*, 437 F.3d at 996.

Taken altogether, the evidence more than sufficed to support a jury finding beyond a reasonable doubt that Mr. Caldwell had the requisite intent to commit the charged offenses.

## B. Rule 404(b) Evidence

Mr. Caldwell moved at the outset of trial to exclude evidence regarding two uncharged transactions—the Caldwells' purchase of their home and the Lewis purchase for which Access Marketing loaned the down payment and received a check exceeding $113,000. The district court denied the motion on the ground that the evidence showed Mr. Caldwell's motive and intent and a common scheme and design. On appeal Mr. Caldwell challenges that ruling. We review challenges to the admissibility of evidence for abuse of discretion. *See United States v. Schene*, 543 F.3d 627, 640 (10th Cir. 2008).

Federal Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Satisfying Rule 404(b) requires that the evidence in question be (1) offered for a proper purpose, (2) relevant, (3) not unduly prejudicial, and (4) accompanied by a proper limiting instruction if requested by the defendant. *See Huddleston v. United States*, 485 U.S. 681, 691–92 (1988).

Our earlier discussion of the sufficiency of the evidence demonstrates how the challenged evidence was probative of Mr. Caldwell's knowledge, from which one can infer his intent. The evidence regarding the Caldwells' home purchase indicated Mr. Caldwell's knowledge of the practice of (1) obtaining down-payment loans but denying the loans on the application form for the mortgage, and (2) using a misleading purchase agreement that sets the sale price above the seller's listed price so that the loan proceeds can be used to repay the down-payment loan and provide cash to the borrower besides. The evidence of the Lewis transaction is less powerful, but it indicated Mr. Caldwell's knowledge of and involvement in Access Marketing's role in down-payment loans, which helped impeach his protestations of ignorance regarding Balang's down-payment loan. Moreover, as Mr. Caldwell concedes, the district court gave a proper instruction limiting the jury's use of this evidence to its bearing on his knowledge intent, preparation, and plan. We see little danger of the evidence having been *improperly* prejudicial and hold that the district court did not abuse its discretion in admitting the evidence.

## C.   Joinder of Mr. Caldwell to Other Codefendants

Before trial Mr. Caldwell filed a motion contending that the indictment improperly joined the charges against him with the charges against his codefendants. The district court denied the motion and Mr. Caldwell challenges

the ruling on appeal. We review questions of joinder de novo. *See United States v. Colonna*, 360 F.3d 1169, 1177 (10th Cir. 2004).

The Federal Rules of Criminal Procedure encourage joinder of defendants. Rule 8(b) states:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

We construe Rule 8 broadly "to allow liberal joinder to enhance the efficiency of the judicial system." *United States v. Morales*, 108 F.3d 1213, 1219 (10th Cir. 1997). Ultimately, "[t]he test for a proper joinder is a common thread to each of the defendants," which "may be established by common evidence as to various counts." *United States v. Rogers*, 921 F.2d 975, 984 (10th Cir. 1990).

Joinder of Mr. Caldwell was undoubtedly proper in this case. There were a number of common threads and much common evidence connecting offenses charged in the indictment. For example, (1) Brandon Baum acted as the real-estate agent for each purchaser and arranged a down-payment loan to the purchaser that was not disclosed to the mortgage lender; and (2) the actual sales price of each home was inflated in the purchase agreement submitted to the lender by use of an undisclosed addendum for nonexistent repairs or remodeling.

Mr. Caldwell argues that because no conspiracy was charged, the only way to satisfy Rule 8(b) was for Mr. Caldwell "to have participated in 'the same series of acts or transactions' that make up the fourteen counts of this Indictment," not just the three that he was charged with. Corrected Aplt. Br. at 17. But Rule 8(b) states, "All defendants need not be charged in each count." Fed. R. Crim. P. 8(b). We have not conditioned joinder in nonconspiracy cases on all defendants' being charged in every count. *See, e.g.*, *United States v. Esch*, 832 F.2d 531, 533–34, 537–38 (10th Cir. 1987) (joinder upheld when three defendants were all charged with multiple counts of sexual exploitation of children, but only one defendant was charged with mailing the photographs). We affirm the joinder of all counts.

### D.     Severance of Mr. Caldwell's Trial

In addition to challenging his joinder in the indictment, Mr. Caldwell filed a pretrial motion to sever his trial from that of his codefendants. The motion was denied and he appeals. We review a district court's denial of severance for abuse of discretion. *See United States v. Zapata*, 546 F.3d 1179, 1191 (10th Cir. 2008).

Under Federal Rule of Criminal Procedure 14(a), a district court has discretion to sever trials if a joint trial "appears to prejudice a defendant." But severance "should be granted only when there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zapata*, 546 F.3d at 1191 (internal quotation marks omitted). The prejudice standard requires

a showing of actual prejudice, not merely a showing that a defendant "may have a *better chance* of acquittal in separate trials," *United States v. Pursley*, 474 F.3d 757, 766 (10th Cir. 2007) (internal quotation marks omitted), or that there would be a "negative spill-over effect from damaging evidence presented against co-defendants," *United States v. Wacker*, 72 F.3d 1453, 1468 (10th Cir. 1995). Mr. Caldwell points to no specific trial right that was prejudiced by joinder. Rather, his concern appears to be only a "negative spill-over effect." *Id.* He argues that severance was necessary because "[t]he criminal scheme alleged to have been repeated . . . by Baum and his associates was hammered into the minds of the jur[y], with a constantly altering and jumbled cast of characters," Corrected Aplt. Br. at 22, leading to a "parade of testimony from those who had already plead[ed] guilty . . . , thus dramatically increasing the danger of guilt by association," *id.* at 23–24. As a result, argues Mr. Caldwell, "[e]ven a cursory reading of the transcript and review of the evidence leaves the distinct impression that everyone was confused by the end." *Id.* at 24.

We are not persuaded. By grouping together the exhibits for each transaction and by organizing its questioning of each of its witnesses to address the transactions separately, the government assisted the jurors in keeping clear which transactions involved Mr. Caldwell and which did not. Also, the district court instructed the jury that "the guilt or innocence of a defendant as to each count or offense must . . . be considered separately," and that "[t]he fact that you

may find one defendant guilty or not guilty as to the crime or offense charged in one count must not control your verdict with reference to any other count or offense charged against that defendant or any other defendant." Supp. R. (C. Caldwell), Doc. 187 at 8. We presume that the jury obeyed these instructions. *See United States v. Eads*, 191 F.3d 1206, 1209 (10th Cir. 1999). Indeed, the jury acquitted codefendant Joseph Conrad Therrien on one count. *See United States v. Dazey*, 403 F.3d 1147, 1165 (10th Cir. 2005) (acquittal of codefendants on some charges showed that jury considered each defendant separately). Accordingly, we find no abuse of discretion in the denial of severance.

## III. CONCLUSION

We AFFIRM Mr. Caldwell's convictions.