FILED
United States Court of Appeals
Tenth Circuit

**March 30, 2009**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

GAYLE L. CALDWELL,

        Defendant - Appellant.

No. 07-6254

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 5:06-CR-00264-HE-2)**

---

Alleen Castellani VanBebber, McDowell, Rice, Smith & Buchanan, P.C., Kansas City, Missouri, for Defendant - Appellant.

Susan Dickerson Cox, Assistant United States Attorney, (John C. Richter, United States Attorney, with her on the brief), Oklahoma City, Oklahoma, for Plaintiff - Appellee.

---

Before **HARTZ**, Circuit Judge**, McWILLIAMS**, Senior Circuit Judge, and **McCONNELL**, Circuit Judge.

---

**HARTZ**, Circuit Judge.

---

Gayle Caldwell appeals her convictions on charges of wire fraud, *see*

18 U.S.C. § 1343, and money laundering, *see id.* § 1956(a)(1)(B)(i), arising from

her role in a fraudulent scheme that involved securing loans for homes at artificially inflated prices. Mrs. Caldwell contends that (1) there was insufficient evidence to convict her of either offense; (2) the district court erroneously admitted evidence of mortgage loans not charged in the indictment; (3) her trial was improperly joined with that of her husband and two other codefendants; and (4) the district court improperly denied her motion to sever her trial from that of her codefendants. We have jurisdiction under 28 U.S.C. § 1291. We hold that there was insufficient evidence to sustain her money-laundering conviction but reject her other contentions.

## I.    BACKGROUND

Mrs. Caldwell and six codefendants were charged in a 14-count indictment in the United States District Court for the Western District of Oklahoma. The charges arose out of fraudulently obtained mortgage loans for six homes in the Oak Tree subdivision in Edmond, Oklahoma, between 2003 and 2005. Mrs. Caldwell was charged with respect to one of the loans.

The fraudulent scheme enabled persons with weak credit to obtain loans that paid the entire purchase price of the homes and gave them money back besides. The mortgage lenders were defrauded in at least two respects. First, the purchase agreement provided to the lender inflated the value of the home. Rather than stating the seller's asking price, it added an additional sum (the Excess Amount) to that price and then, in an addendum not disclosed to the lender,

provided that the Excess Amount would not go to the seller but would be used to pay a contractor for repairs or remodeling of the home. The named contractor, however, was a sham, merely a bank account used to funnel money to the purchaser and other participants in the scheme. Second, the lenders were told that the purchasers had used their own funds to make the down payments on the homes. But the purchaser in fact borrowed the down payment from participants in the scheme and paid them back out of the Excess Amount. At trial, representatives of the lenders said that each loan application would have been rejected if the lender had known of either the addendum or the down-payment loan.

Mrs. Caldwell and her husband, Charles E. Caldwell Jr., had full-time jobs as pharmaceutical representatives. Although Mrs. Caldwell had obtained a real-estate license some 15 years earlier, she had never worked in that field and got involved in the charged scheme through her husband. In 2002 he began to supplement his income as a part-time mortgage broker. At first he worked for Skyline Mortgage (which had no involvement in the scheme). He then moved to United Lending, where he participated in three fraudulent loan transactions for which he was convicted. *See United States v. Charles Caldwell*, No. 07-6251 (10th Cir. Mar. 30, 2009). United Lending was owned by Linda Jew and managed by her husband Anthony, a central figure in the fraudulent loans.

About 15 months after Mr. Caldwell began working for United Lending, Mrs. Caldwell purchased a company named Access Marketing Services, Inc. from Mr. and Mrs. Jew for $500. The sole business of the company was lending money to home purchasers to make their down payments.

Mrs. Caldwell's convictions arose out of one transaction in January 2005, a mortgage loan to Fenella Balang for the purchase of 1709 Irvine Drive. The property had been listed at $575,000 before the seller reduced the asking price to $550,000. Yet the purchase agreement stated a sale price of $800,000 and included an addendum requiring the seller to make payments at closing totaling $220,000. The seller was led to believe that the money was for repairs to the home, although the addendum did not name a specific (sham) construction company. As was the case with the other transactions charged in the scheme, the addendum was not disclosed to the lender.

Balang borrowed her $120,000 down payment, yet indicated on her loan application that no part of the down payment had been borrowed. The loan officer listed on her application was Mr. Caldwell. The down-payment loan was repaid out of the mortgage-loan proceeds, which also were used to pay Balang $92,000.

There was evidence at trial that Mrs. Caldwell was involved in two aspects of the transaction. First, she testified that when Mr. Jew had asked her whether her company, Access Marketing, could lend the $120,000 for Balang's down

payment, she referred him to ProSpect Marketing Services, which ultimately supplied the down payment. Second, at closing, which Mr. Caldwell attended, $10,000 of the loan proceeds went to Access Marketing. An Access Marketing invoice for the $10,000 was provided to the title company that handled the closing, although Mrs. Caldwell denied preparing the invoice and suggested that Mr. or Mrs. Jew must have been responsible for it. According to the closing statement, the $10,000 was for "marketing service to Access Marketing." Add. to Br. of Pl.-Aplee. (Gayle Caldwell) at 228. Mrs. Caldwell testified that the $10,000 was a referral fee because she had told Mr. Jew about ProSpect Marketing. Of the $10,000, Mrs. Caldwell disbursed $4,500 to her husband (the transaction that formed the basis of her money-laundering charge) and $3,500 to Mrs. Jew, apparently keeping the remaining $2,000 in Access Marketing's account. These payments were in addition to the mortgage brokerage fee to United Lending (of which Mr. Caldwell received 65%), which was listed on the closing statement.

Mrs. Caldwell's account of her involvement in the Balang transaction was contradicted by testimony from Mr. Jew. He denied that Mrs. Caldwell (or anyone else) had referred him to ProSpect Marketing. He testified that he spoke only with Mr. Caldwell, asking him if Access Marketing could lend $120,000 to Balang for her down payment, but that Mr. Caldwell had replied that the amount was too large. As for the $10,000 paid to Access Marketing at closing, he denied

that he or his wife prepared the invoice and said that the involvement of Access Marketing was only to help the mortgage brokers (Mr. and Mrs. Jew and Mr. Caldwell) take money out of the transaction. He explained that "out of greed" they had decided to take another $10,000 from the loan proceeds and used Access Marketing to facilitate that action. R., Trial Tr. Vol. 10 at 1586.

To help prove Mrs. Caldwell's motive, intent, and knowledge of a common scheme and design, the government presented evidence of two uncharged mortgage-loan transactions in which she had been involved. The first transaction was the loan for the Caldwells' own home purchase, which occurred in August 2003, more than a year before the Balang loan. The Caldwells' loan presented many of the features of the fraudulent scheme. The seller listed the home at $320,000, but the purchase agreement, which was signed by the Caldwells and provided to the mortgage lender, set the price at $350,000. Also, the Caldwells borrowed $17,914.14 for their $19,255.59 down payment. Yet the loan application, which Mrs. Caldwell signed, represented that they had not borrowed funds to make their down payment. Although the purchase agreement did not include an addendum requiring the seller to pay for remodeling or repairs, the transaction was nevertheless conducted with the understanding that the seller would return $34,500 of the loan proceeds. From that $34,500 the Caldwells' down-payment loan was repaid and they received more than $12,000 to boot.

The other uncharged transaction was a mortgage loan to Decell Lewis in November 2004, two months before the Balang transaction. Mr. Caldwell was the loan officer. As with the charged transactions, the sale price had been inflated (from the listed price of $225,000 to $360,000 on the purchase agreement), an addendum to the purchase agreement required the seller to pay $97,000 at closing for repairs, and the purchaser borrowed money for the down payment. Access Marketing was the down-payment lender. This was Access Marketing's second loan since Mrs. Caldwell had acquired the company a month earlier. The down-payment loan to Lewis was $17,267.87, but at closing Access Marketing submitted to the title company handling the closing an invoice for a much larger sum, $113,155.07, as a "Marketing Service Fee." Add. to Br. of Pl.-Aplee. (Gayle Caldwell) at 292. Mrs. Caldwell testified that Mr. or Mrs. Jew, not she, prepared the invoice, an allegation denied by Mr. Jew. At closing Mr. Caldwell endorsed the $113,155.07 check for deposit in Access Marketing's account. Out of that sum, Mrs. Caldwell wrote a $59,000 check to Lewis, and $10,000 to Lewis's real-estate agent. She also wrote a $16,000 check to her husband, and a $5,000 check to herself, leaving $23,155.07 in the Access Marketing account.

## II.   DISCUSSION

We address the issues on appeal in the following order: (1) sufficiency of the evidence of wire fraud; (2) admissibility of evidence of the uncharged transactions; (3) Mrs. Caldwell's joinder with codefendants in the indictment; (4)

failure to sever her trial from that of the codefendants; and (5) sufficiency of the evidence of money laundering.

### A. Sufficiency of the Evidence of Wire Fraud

We review the evidence de novo to determine whether a reasonable jury, viewing the evidence in the light most favorable to the prosecution, could find Mrs. Caldwell guilty beyond a reasonable doubt. *See United States v. Parker*, 553 F.3d 1309, 1316 (10th Cir. 2009). "To convict a defendant of wire fraud, the government must prove three elements: (1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) a use of an interstate wire in furtherance of the fraudulent scheme." *United States v. Turner*, 551 F.3d 657, 664 (7th Cir. 2008). The wire communication alleged in the count against Mrs. Caldwell was the wire transfer of $683,954.50 in loan money from the mortgage lender, Long Beach Mortgage Company, to the title company handling the closing.

Mrs. Caldwell does not challenge the existence of a fraudulent scheme, nor does she dispute that the wire transfer furthered the scheme. Thus, we are concerned only with (1) her participation (did she assist the scheme?), and (2) her knowledge (if she did assist, did she know that what she was assisting was a fraud?).

Ironically, the best evidence of Mrs. Caldwell's assistance in the Balang transaction was her own testimony. She told the jury that Access Marketing

-8-

earned the $10,000 "marketing service" fee by referring Mr. Jew to the eventual down-payment lender. According to Mrs. Caldwell, when Mr. Jew asked her whether Access Marketing could lend $120,000 to Balang, she told him that the sum was too large for her but recommended ProSpect Marketing, which ultimately provided the loan. Even though her testimony was not introduced in the government's case, this evidence can be used to support the verdict. *See United States v. Delgado-Uribe*, 363 F.3d 1077, 1082 (10th Cir. 2004) ("If a defendant chooses to present additional evidence [after a motion for judgment of acquittal is denied], the defendant *waives* the right to have the sufficiency of the evidence tested by the government's case alone and we review the entire record on appeal." (internal quotation marks omitted)); *cf.* Fed. R. Crim. P. 29(b) (if a motion for judgment of acquittal is made at the end of the government's case, but the court reserves its decision, "it must decide the motion on the basis of the evidence at the time the ruling was reserved"). This was not, however, the government's theory of its case against Mrs. Caldwell. Indeed, Mr. Jew, who was a key witness for the government, testified that Mrs. Caldwell said nothing about ProSpect Marketing and that he contacted that company on his own.

To provide a coherent discussion of the sufficiency of the evidence on the wire-fraud charge, we will analyze the evidence from the government's perspective, which, like Mrs. Caldwell's version, supports a finding of her participation in the scheme, but which in addition strongly supports a finding of

her fraudulent intent. The government's theory was that Mrs. Caldwell assisted the scheme by supplying the means to channel some of the mortgage-loan proceeds to those participating in the scheme. The closing statement for the Balang purchase listed a $10,000 "marketing service" fee to Access Marketing. Add. to Br. of Pl.-Aplee. (Gayle Caldwell) at 228. At closing Access Marketing submitted an invoice for that amount and it was paid out of the loan proceeds. Access Marketing then disbursed $3,500 to Mrs. Jew and $4,500 to Mr. Caldwell, leaving $2,000 in the Access Marketing account. Thus, Mrs. Jew received 35% of the money, and the Caldwells jointly received the other 65%. (This 65%/35% division was the same split of United Lending's mortgage-broker fee that Mr. Caldwell was to receive when he obtained a client and acted as loan officer.) According to Mr. Jew, it was necessary that the $10,000 be funneled through Access Marketing because United Lending was already slated to receive $32,690 for its commission in brokering the Balang transaction, the maximum that the company could receive under lending guidelines. Consequently, if any additional money were to be paid to the Caldwells and Mr. and Mrs. Jew, it had to be characterized as something other than a brokerage commission. Hence, the "marketing service" fee to Access Marketing. This evidence was sufficient for the jury to find beyond a reasonable doubt that Mrs. Caldwell assisted in the scheme by serving as a conduit of loan proceeds to the scheme participants.

That leaves the question whether there was sufficient evidence that Mrs. Caldwell had the requisite fraudulent intent—that is, whether she participated with the knowledge that she was furthering a fraudulent scheme. In our view, the question is not a close one.

To begin with, there is evidence that Access Marketing received the $10,000 at closing without having performed any services. Although Mrs. Caldwell testified that she earned the $10,000 by referring Mr. Jew to the down-payment lender, he denied that she did, and Mrs. Caldwell did not suggest that Access Marketing had earned the $10,000 in any other fashion. (It is also interesting to note that this $10,000 "fee" exceeded the $8,050 commission earned by the company that actually provided the $120,000 down-payment loan.) In legitimate commercial transactions, people are not ordinarily paid large sums for trivial efforts. A jury could reasonably infer that someone who receives $10,000, despite having done nothing to earn it, likely knows that something crooked is afoot. *See United States v. Chavez-Marquez*, 66 F.3d 259, 262 (10th Cir. 1995) (large sum ($4,000) paid to defendant for relatively minimal effort (driving car from El Paso to Albuquerque) supported inference that defendant knew that he was transporting contraband).

Further supporting an inference of Mrs. Caldwell's knowledge is her participation in prior fraudulent mortgage loans. With respect to her own home mortgage, she (1) signed a purchase agreement overstating the price of her home;

(2) obtained a down-payment loan, yet denied doing so on her loan application; and (3) received over $12,000 in loan proceeds for her own purposes. She was certainly no stranger to the sort of fraud employed in the Balang transaction. And her participation in the Lewis loan shows that she was also familiar with using Access Marketing as a conduit to conceal the true destination of loan proceeds. At the Lewis closing Access Marketing received more than $113,000, which she then disbursed to multiple parties, including the purchaser, her husband, and Mr. and Mrs. Jew.

Moreover, a jury could infer that she had learned from her husband the fraudulent nature of the mortgage-loan transaction. After all, their involvement in mortgage lending was a joint affair in several respects. She had bought Access Marketing from Mr. Caldwell's bosses, Mr. and Mrs. Jew; Access Marketing had made down-payment loans to customers for whom Mr. Caldwell was the loan officer; and Mr. Caldwell had even performed tasks for Access Marketing, such as endorsing a check. *See generally Charles Caldwell*, No. 07-6251 (discussing sufficiency of the evidence of Mr. Caldwell's knowledge of the fraudulent scheme).

Finally, the jury could infer Mrs. Caldwell's guilty knowledge if they disbelieved her exculpatory testimony. For example, to explain Access Marketing's receipt of $10,000, she testified that she had referred Mr. Jew to Balang's down-payment lender, but the jury could have credited Mr. Jew's denial

-12-

that she made the referral. "[F]alse exculpatory statements . . . are admissible to prove circumstantially consciousness of guilt or unlawful intent." *United States v. Davis*, 437 F.3d 989, 996 (10th Cir. 2006) (internal quotation marks omitted).

Viewing the evidence in the light most favorable to the government, we hold that the jury had ample grounds to find that Mrs. Caldwell had the requisite intent to defraud.

## B.    Rule 404(b) Evidence

Mrs. Caldwell challenges the district court's decision to admit evidence of two uncharged transactions—the Caldwells' mortgage loan for their own home and the Lewis home purchase for which Access Marketing loaned the down payment. The district court admitted this evidence under Federal Rule of Evidence 404(b) to show Mrs. Caldwell's motive and intent and a common scheme and design. We review the decision to admit evidence under an abuse-of-discretion standard. *See United States v. Schene*, 543 F.3d 627, 640 (10th Cir. 2008). We see no abuse of discretion here. As demonstrated in our discussion of the sufficiency of the evidence of wire fraud, this evidence was probative on the issues of knowledge and intent. And there is little likelihood that the jury used this evidence for an improper purpose because, as Mrs. Caldwell concedes, the district court gave a proper limiting instruction. *See Charles Caldwell*, No. 07-6251, slip op. at 21–22 (holding same evidence was properly admitted against Mr. Caldwell).

## C.    Joinder and Severance

Mrs. Caldwell appeals the district court's denial of her pretrial motion alleging that the indictment improperly joined the charges against her with the charges against her codefendants.  We review joinder de novo.  *See United States v. Colonna*, 360 F.3d 1169, 1177 (10th Cir. 2004).  Federal Rule of Criminal Procedure 8(b) allows an indictment to charge multiple defendants "if they are alleged to have participated . . . in the same series of acts or transactions, constituting an offense or offenses."  This standard is satisfied by showing "a common thread to each of the defendants," which "may be established by common evidence as to various counts."  *United States v. Rogers*, 921 F.2d 975, 984 (10th Cir. 1990).  As further explained in our companion opinion in *Charles Caldwell*, No. 07-6251, we hold that joinder was proper because the Balang transaction shared multiple features with the other transactions charged in the indictment.

Similarly, Mrs. Caldwell argues that the district court wrongly denied her motion to sever her trial from that of her codefendants, a decision we review for abuse of discretion.  *See United States v. Zapata*, 546 F.3d 1179, 1191 (10th Cir. 2008).  Federal Rule of Criminal Procedure 14(a) grants a district court discretion to sever the trials of properly joined defendants if a joint trial "appears to prejudice a defendant."  Mrs. Caldwell argues that she suffered prejudice because "at least 5/6 of the evidence was not relevant to the case against Gayle Caldwell,"

-14-

thereby risking guilt by association. Aplt. Br. at 24. We are not persuaded. We have said that Rule 14(a)'s prejudice standard requires a showing of actual prejudice, which is not satisfied merely by pointing to a "negative spill-over effect from damaging evidence presented against codefendants." *United States v. Wacker*, 72 F.3d 1453, 1468 (10th Cir. 1995). Mrs. Caldwell has not made the necessary showing. The government separately grouped together the exhibits for each transaction and its questioning of its witnesses addressed the transactions separately. Moreover, the district court instructed the jury that "[t]he fact that you may find one defendant guilty or not guilty as to . . . one count must not control your verdict with reference to any other count or offense charged against that defendant or any other defendant." Supp. R., Pleading (Charles Caldwell), Doc. 187 at 8. Not only do we presume that juries follow such instructions, but the jury's acquittal of codefendant Joseph Therrien on one count gives us extra confidence that there was no abuse of discretion in the denial of severance. *See Caldwell*, No. 07-6251, slip op. at 24–25.

### D.   Sufficiency of Evidence of Money Laundering

In addition to wire fraud, Mrs. Caldwell was also convicted of money laundering under 18 U.S.C. § 1956. She contends that there was insufficient evidence to sustain the conviction. We agree.

The pertinent language of § 1956 is as follows:

-15-

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

* * *

(B) knowing that the transaction is designed in whole or in part—
    (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . .

shall be sentenced to . . . imprisonment for not more than twenty years . . . .

To establish the crime, the government must prove four elements: (1) that the defendant knowingly conducted a financial transaction, (2) that the funds involved were proceeds of a specified unlawful activity, (3) that the defendant knew that the funds involved were proceeds of that unlawful activity; and (4) that the transaction was designed to conceal the nature, location, source, ownership, or control of the proceeds. *See United States v. Rahseparian*, 231 F.3d 1267, 1272 (10th Cir. 2000). *Specified unlawful activity* is defined to include wire fraud. *See* 18 U.S.C. § 1956(c)(7)(A); *see also id.* § 1961(1). The financial transaction charged in the indictment was Access Marketing's $4,500 check to Charles Caldwell after it received the $10,000 "marketing service" fee from the proceeds of the Balang mortgage loan.[1]

---

[1]The indictment's money-laundering count against Mrs. Caldwell alleges that she

(continued...)

There can be no question that the check was from proceeds of the mortgage loan to Balang; and we have already explained that the evidence was sufficient for the jury to find that the mortgage loan was obtained through wire fraud in which Mrs. Caldwell knowingly participated. Thus, the only question remaining is whether the writing of the $4,500 check to Mr. Caldwell was "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of" the wire fraud. 18 U.S.C. § 1956(a)(1)(B)(i); *see Cuellar v. United States*, 128 S. Ct. 1994, 2003 (U.S. 2008) (construing the identical "designed . . . to conceal" language in 18 U.S.C. § 1956(a)(2)(B)(i), relating to the transportation of monetary instruments and funds).

---

[1](...continued)
did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, that is, the transfer of funds by means of a check in the amount of $4,500.00 on Access Marketing Service, Inc.'s account . . . payable to Charles Caldwell for a "referral fee," which involved the proceeds of a specified unlawful activity, that is, wire fraud as described in Count 12 in violation of Title 18, United States Code, Section 1343, knowing that the transaction was designed in whole or in part to conceal and disguise the source, ownership and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transaction, [she] knew the property involved in the financial transaction represented the proceeds of some form of an unlawful activity.

R., Vol. 1, Pleadings (Gayle Caldwell), Doc. 1 at 32–33.

As noted above, the evidence at trial indicated that Access Marketing was involved in Balang's loan for the purpose of disguising the fact that Mr. Caldwell and United Lending (Mrs. Jew, to be specific) were receiving a significantly larger "commission" on the transaction than was permitted. Indeed, United Lending was already to receive a $32,690 commission, which Mr. Jew testified was the maximum a mortgage broker could collect under lending guidelines. To circumvent this cap, the participants in the scheme misrepresented the additional $10,000 they would receive as a "marketing service" fee to Access Marketing. Thus, the use of Access Marketing helped conceal and disguise the fraudulent scheme from the mortgage lender.

But once Access Marketing received the $10,000 from the loan proceeds, the concealment ended. Access Marketing's $4,500 check to Mr. Caldwell (as well as the $3,500 check to Mrs. Jew) not only failed to conceal what was going on, it actually exposed it. The checks revealed that the money paid to Access Marketing was slated to go to the mortgage brokers all along. Money laundering requires more than simply writing a check with the proceeds of unlawful activity. We have repeatedly stated that § 1956 is not a "money spending statute." *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1475 (10th Cir. 1994) (internal quotation marks omitted). We fail to see how the check to Mr. Caldwell concealed any aspect of the wire-fraud scheme, or how Mrs. Caldwell could have intended it to do so.

The government's sole argument with respect to the "designed . . . to conceal" element is that Mrs. Caldwell "knew that moving the money quickly out of the Access Marketing account would conceal the nature, location, source, ownership and control of the money." Aplee. Br. at 25. This argument tracks the prosecution's lone comment on the matter at closing argument:

> The evidence is clear, ladies and gentleman, as soon as [the $10,000 referral fee] hits Access Marketing, Gayle Caldwell does what she has to do to get the bulk of that money out of Access Marketing so that it won't be known that Access Marketing is sitting on that $10,000 it didn't earn, because 8,000 of the 10,000 gets paid out immediately by Gayle Caldwell, first to Linda Jew, and then to Chuck Caldwell to take the ownership and control out of Access Marketing.

R., Trial Tr. Vol. 13 at 2333.

This argument is nonsensical. We fail to see how the quick disbursement furthered any concealment or disguised anything. The timing, rather, confirms that from the outset the money was to go to Mr. Caldwell and Mrs. Jew. Nor do we see how the transaction was intended to conceal that Access Marketing did nothing to earn the money. The whole point of using Access Marketing was to make it appear that the company *had* earned the money. There would be no reason for Mrs. Caldwell to want to conceal that the money belonged, at one point, to Access Marketing.

Accordingly, we hold that no reasonable juror could have found beyond a reasonable doubt that Access Marketing's $4,500 check to Mr. Caldwell was

"designed in whole or in part . . . to conceal or disguise, . . . the source, the ownership, or the control of the proceeds" of the wire fraud. 18 U.S.C. § 1956(a)(1)(B)(i). We therefore reverse Mrs. Caldwell's conviction of money laundering.

## III.   CONCLUSION

We AFFIRM Mrs. Caldwell's wire-fraud conviction and REVERSE her money-laundering conviction.